184 N.J. Super. 11 (1982)
445 A.2d 46
MONA R. SHEERR, INDIVIDUALLY, AND AS THE PERSONAL REPRESENTATIVE OF THE ESTATE OF SALLY SHEERR, DECEASED, PLAINTIFF,
v.
THE TOWNSHIP OF EVESHAM AND THE MAYOR AND THE TOWNSHIP COUNCIL OF THE TOWNSHIP OF EVESHAM, DEFENDANTS.
Superior Court of New Jersey, Law Division Burlington County.
Decided January 22, 1982.
*16 Michael D. Varbalow for plaintiff (Jubanyik, Varbalow & Tedesco, attorneys).
William Ruggierio for defendants (Ruggierio & Freeman, attorneys).
HAINES, A.J.S.C.
This is a "taking" case. A large wooded portion of the Sheerr property was first zoned by Evesham Township for public park and recreation purposes and, by later amendment, for conditional uses considered appropriate for environmental reasons. No permitted use was established, except in the sense that conditional uses are permitted uses. Other ordinances provided further restrictions.
These regulations are claimed to be so restrictive as to constitute a taking of private property for public use, requiring just compensation under the Fifth Amendment to the United States Constitution and Art. I, par. 20, of the New Jersey Constitution (1947).
Regulation may constitute a taking:
The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. [Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922)]
The present case raises difficult and largely unanswered questions concerning such takings. The basic issue, whether the regulations have gone too far, is not easily decided, and novel questions arise when it is decided, as here, that they have. It must then be determined whether the municipality is obliged to acquire the property, paying "just compensation," or whether the regulation should be invalidated and, if so, whether damages for a temporary taking are recoverable.
In addition to the "taking" issue, plaintiffs advance the theory that Evesham, through its adoption of arbitrary and otherwise invalid legislation, has violated their right to due process under the Fourteenth Amendment to the United States Constitution *17 and Art. I, par. 1, of the New Jersey Constitution (1947), consequently entitling them to the recovery of damages under the Federal Civil Rights Act, 42 U.S.C.A. § 1983. The theory has only inferential support in a few cases.
Plaintiffs also attack another zoning provision of the township which restricts part of their property to commercial uses; they claim that this zoning is arbitrary.
The two portions of plaintiff's property involved in these proceedings consist of vacant land fronting on Route 73, a busy state highway; the frontage of the wooded tract is 1,250 feet, of the commercial tract, 1,050 feet. Existing land uses along the highway are primarily commercial, becoming somewhat scattered in the area of plaintiff's premises. Across Route 73 are a funeral home, a life care facility and undeveloped woodlands. South of the property are a commercial office and a residential development. To the rear is a major residential development with reverse frontage. To the north lies the Garden State Community Hospital and a medical center. Route 73 and two side roads provide access. A by-pass road, shown on Evesham Township's master plan and official map, will bisect the property, connecting Route 73 and routes to the Ashland High Speed Line. The residential development in the rear of plaintiff's property is planned to accommodate this by-pass.
Prior to the adoption of the challenged ordinance plaintiff's property (meaning, throughout this opinion, the portions thereof in dispute) was zoned "GB" and "GB-5," permitting commercial uses along the highway. The GB zone permitted uses on one-acre lots; GB-5 required five-acre lots. In January 1979 Evesham adopted Ordinance 1-1-79, amending its zoning legislation to conform to the new Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq. This ordinance placed the wooded portion of plaintiff's property (formerly zoned GB-5) in a "PPR" district, which permitted only public park and recreational uses. The remaining portion of the property (formerly zoned GB) was zoned "CH-5," a highway commercial district, in which subdivisions *18 of not less than five acres were permitted. Plaintiff's claim that the PPR designation amounted to a taking of their property and that the CH-5 designation is arbitrary.
On April 17, 1979 the township adopted Ordinances 9-4-79 and 11-4-79 changing plaintiff's PPR designation to "EP-1: Environmental Protection." No permitted use was allocated to the EP-1 zone. Conditional uses, allowed after obtaining municipal permission, consisted of:
Private recreational areas such as camps, golf courses, playgrounds, athletic fields, lakes, picnic areas, operated for profit or hire....
Single family detached dwellings....
The following commercial uses....:
1. Retail stores
2. Offices
3. Bank or other financial institution
4. Bakery, confectionery or custom shop
5. Restaurants
6. Theaters
7. Any use of the same general character as above.
No use was permitted on a lot of less than five acres and significant design criteria were established. The ordinance recited, as reasons for the EP-1 designation, the "unique character by virtue of the presence of a Beech and Maple hardwood forest with many Holly trees thereon, the function of the area as a natural replenishing of ground water and the function of the area as a natural habitat for birds and other wildlife."
Written protests were filed (pursuant to N.J.S.A. 40:55D-63) against the adoption of the EP-1 ordinance, which thereafter received a favorable vote of 3 to 2. The statute required a 4 to 1 favorable vote. The municipality, relying upon the Appellate Division's opinion in Levin v. Parsippany-Troy Hills Tp., 164 N.J. Super. 409 (1978), believed that the protest statute did not apply in its circumstances, and therefore considered the ordinance valid. Levin was reversed by the Supreme Court, 82 N.J. 174, 181 (1980). As a consequence, Evesham's ordinance establishing the EP-1 zoning was invalidated in a summary judgment ruling in these proceedings. Finally, in June 1980, new, but identical EP-1 legislation was adopted by a 4 to 1 vote.
*19 On April 17, 1979 Evesham enacted Ordinance 12-4-79, which adopted an official map for the township. This map placed a portion of plaintiff's property in a "Proposed Preservation Area." The township's master plan designated that property "Park or Preservation Area." Plaintiff argues that these restrictions significantly and adversely affected every potential use of her property.
On February 5, 1980 the township adopted Ordinance 43-10-79, restricting the cutting of trees and shrubs on lands reserved for public use. This ordinance affected plaintiff's property while it was zoned PPR, and so long as the official maps carried it in a "Park or Preservation" classification. In December 1980 Ordinance 43-10-79 was amended by Ordinance 56-12-80, designed to protect trees and shrubs growing in a natural state anywhere within the township; it required a permit, renewable annually, to be obtained before any trees or shrubs could be removed and also authorized the planning board to protect trees in a development by requiring a developer to convey a "tree preservation easement" to the township. The amended ordinance affected and continues to affect all of plaintiff's property.
Plaintiff claims that these ordinances, severally and collectively, effected a taking of their property without just compensation. They also claim that they are arbitrary, violating due process and equal protection requirements. Relief sought consists of (1) an order requiring the municipality to purchase the property, or (2) invalidation of the ordinances and (3) damages.

The Setting
Evesham's legislative history underlines an intent to preserve the plaintiff's property for the benefit of the public while avoiding payment of compensation.
On January 30, 1979 its governing body adopted the new zoning ordinance applying a "PPR" (Public Parks and Recreation) classification to the property. When the new ordinance was discussed on January 16, 1979 the solicitor warned members of the township council that the PPR designation probably *20 amounted to unconstitutional taking. The governing body, not prepared to treat plaintiff's property otherwise, decided to adopt the ordinance without change, believing that any damages it might have to pay would be minimal. At the same time, township officials knew that plaintiff had executed an agreement to sell the entire tract of land. The attorney for the buyers had appeared before the governing body, advised them of his client's interest and warned them that the PPR designation under consideration was illegal. Shortly after the new ordinance was adopted these buyers terminated their agreement because they could not use the property as zoned.
In December 1978 the township adopted a master plan and an official map. The map designated the plaintiff's property as "Park or Preservation Area." Under N.J.S.A. 40:55D-44, in connection with subdivision or site plan approval, a property so designated in a master plan or on an official map is subject to acquisition. The statute permits the planning board to reserve the location and extent of streets, drainageways, basins and public areas for a period of one year after approval of a final plat of a development, during which it may arrange for the acquisition of the reserved areas. Thus, a developer must risk considerable time and expense in taking a proposed plan of development through planning board processes to the point of final approval and then face a one-year delay before he knows whether he may proceed with his approved plans or whether all or part of the property is to be acquired by the municipality. While the statute requires the developer to be compensated for his actual loss, in the event of acquisition, the reservation offers the considerable likelihood that a developer will take no interest in acquiring the property. This conclusion was supported by trial testimony.
On April 17, 1979 the township amended its zoning ordinance to create an EP-1 (Environmental Protection) zone, a classification applied originally to only two properties in the township. Plaintiff's EP-1 zone contained about 55 acres; the adjoining second tract (owned by a third party) contained only 4.6 acres. *21 The second tract is no longer zoned EP-1, so that plaintiff's property is now the only one so zoned. As noted above, the ordinance was not effective because it did not receive the required number of votes at the time of its claimed adoption. A new ordinance, containing identical provisions, was enacted by lawful vote in June 1980. These ordinances were adopted in the face of strong public protests by the affected property owners, who claimed that the ordinance amounted to a confiscation of their property. It limited the properties to restrictive conditional uses, allegedly justified by environmental concerns. These concerns were suspect; contrary information produced by plaintiff during public argument against the ordinance raised serious questions about the governing body's assumptions, which, as shown below, were not valid.
The discussions of the township officials during their consideration of the adoption of the PPR and EP-1 ordinances are revealing. At the meeting of January 16, 1979 when the PPR regulations were adopted for plaintiff's property, the township solicitor advised the governing body that the designation probably was unconstitutional. It was nevertheless adopted because the governing body (erroneously) thought that it had to be adopted before February 1, 1979. It was believed that an amendment changing the zoning of plaintiff's property could be adopted in a matter of days so that any exposure of the township to damages would be very modest.
On February 15, 1979 further discussion was devoted to plaintiff's zoning. One councilman understood the PPR designation to indicate property intended for "Green Acres" (State) funding. It was reported that the planning board attorney questioned the propriety of placing plaintiff's property in the PPR zone. This property was the only private parcel of land so designated in Evesham Township. Lands directly across the highway from plaintiff's property were zoned CH-5, permitting certain commercial uses, thus distinguishing them from both PPR and EP-1 uses applied to plaintiff's property.
*22 Various councilmen were deposed. One attempted to distinguish the properties, but his statements indicate very little distinction. He said he would seriously consider buying the premises if there was no other reasonable alternative, but, because he was in the minority, believed some other means of preservation should be found. Another member of council expressed the belief that acquisition of plaintiff's property was appropriate. The mayor testified that his main objective in zoning the property was to protect its aquifer recharging function; according to the township planner, this concern was significant. He did not believe that the recreational uses proposed by the EP-1 ordinance were practical since substantial fill would be required. He said he could not get excited about using the property as a wildlife habitat; it would not last long by reason of the traffic on Route 73 and the proposed by-pass. The mayor remembered a discussion about whether the township could afford to purchase plaintiff's premises; he doubted this possibility. It was his feeling, however, that plaintiff's woodlands were probably unique. Another councilman expressed a belief that Evesham should not purchase plaintiff's property until it had exhausted all alternatives, including the adoption of the EP-1 zoning; buying should be a last resort.
At a caucus meeting held on April 10, 1979 one councilman pointed out that the EP-1 zoning would do what the master plan recommended for the property, namely, permit its preservation. At a later meeting concerning the EP-1 ordinance held on April 17, 1979, the township planner said that he had always recommended some preservation of plaintiff's lands. One councilman said that the ordinance was "conditional" because the township was still groping for a solution to the problem of preserving the property without being required to undertake its purchase. He thought the EP-1 zoning should be adopted; it put Evesham in a better position than the PPR zoning and would permit the owners to negotiate with the township concerning the use of the property. The solicitor advised council point-blank that the PPR zone was not constitutional and should *23 not be continued. He recommended the adoption of the EP-1 ordinance until a better plan could be worked out. Another councilman said that the planner's recommendations (reflected in the EP-1 classification) should be adopted; all environmental factors pointed in that direction and he recognized the need to preserve open space.
At the meeting of September 2, 1980, after the initial EP-1 ordinance had been invalidated, a new EP-1 ordinance was under consideration. By then council had received numerous warnings that "taking" problems were involved. This suit had been instituted. At this meeting one councilman stated that there was absolutely no intention to preserve the parcel for public use or recreational use, or any other particular use. Another councilman said he never thought this was a taking, that no one on council had said so, that the Township's only interest was in allowing development of the property while preserving the environment.

I. The Constitutional Provisions

A. Federal

The "taking" issue arises under the Fifth Amendment to the United States Constitution (enforceable against the states through the Fourteenth Amendment) which provides, "... nor shall private property be taken for public use, without just compensation."
The Fourteenth Amendment is also involved. It provides: "... nor shall any State deprive any person of life, liberty, or property, without due process of law."

B. New Jersey

Art. I, par. 20, of the New Jersey Constitution (1947) provides that "Private property shall not be taken for public use without just compensation."
Art. IV, § 6, par. 3, requires that takings by eminent domain "shall be with just compensation." Art. I, par. 1, contains the due process clause. It provides:

*24 All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property and of pursuing and obtaining safety and happiness.
This provision of our Constitution has been interpreted as substantially encompassing rights guaranteed under the Federal Constitution. Montville v. Block 69, Lot 10, 74 N.J. 1, 18 (1977). The Montville court said that "in fact, we have at times interpreted our State Constitution to provide greater protections than those existing under analogous Federal provisions". Particularly appropriate here is Pennsylvania-Reading S.S. Lines v. Public Utility Comm'rs Bd., 5 N.J. 114, 124 (1950), in which the court said: "Under the guise of regulation, the property of a railroad may not be taken by requiring services or facilities not reasonably necessary to serve the public." It applied Art. I, pars. 1 and 20, of the New Jersey Constitution and the Fourteenth Amendment to the Federal Constitution.

II. The Cases

A. Decisions of the United States Supreme Court

(1) Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).
This is the precursor of all cases dealing with questions of taking by regulation. Justice Holmes, who wrote the majority opinion, said:
Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power. [at 413, 43 S.Ct. at 159]
Thus, the rule was established that a difference of degree and not of kind distinguished a regulation from a taking. On this basis the court held that a statute which prohibited mining of *25 coal, where the coal company had title, was unconstitutional as a taking of the mining company's property rights without due process, although the mining would cause the probable destruction of plaintiff's dwelling which rested on the bed of coal. The Pennsylvania Coal Co. test, recited above and repeated here, has been adopted in many subsequent cases:
The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. [at 415, 43 S.Ct. at 160]
(2) Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).
This was the first zoning case considered by the United States Supreme Court. Ambler alleged that a zoning ordinance deprived it of due process and equal protection, claiming it reduced the value of its land from $10,000 to $2,500 an acre. The court upheld the ordinance, but did so without reaching the taking issue.
(3) Zahn v. Board of Public Works, 274 U.S. 325, 47 S.Ct. 594, 71 L.Ed. 1074 (1927).
In this case the court upheld a zoning ordinance, citing Euclid. The taking clause was not involved.
(4) Nectow v. Cambridge, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928).
Plaintiff's land was zoned for residential uses after he had executed an agreement to sell the property for an industrial use at price of $63,000; the land was "of comparatively little value" under the residential classification. The court held that the owner's loss in value was much greater than the value of the zoning classification to the community. The ordinance was held to be invalid. There was no discussion of taking by regulation. The court merely found a violation of the Fourteenth Amendment because there was no clear community interest in the regulation.

*26 (5) Penn Central v. New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).
New York adopted a regulation which prohibited the demolition of Grand Central Station. The Supreme Court nevertheless held that Penn Central was not deprived of its Grand Central property without due process. The test: Was there a deprivation of all reasonable return on the property? The New York regulation provided a noncash compensation consisting of the grant of transferrable development rights which were of value to Penn Central in connection with other properties it owned in the area. This was held to satisfy the constitutional demand; the development rights represented a reasonable return. The court, in fixing the basis upon which to calculate that return, excluded the portion of the current market value of the property conferred upon it by the community. The value question is difficult. (What would the value of the terminal be without government and community activity? Stated differently, what part of the building's value was conferred privately?)
(6) Agins v. Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).
After plaintiff purchased land in Tiburon, California, its use was restricted by a zoning ordinance, decreasing its value. The City of Tiburon was sued for damages on a theory of inverse condemnation and for a declaration that the zoning ordinance was unconstitutional. A taking without just compensation was alleged. Under the ordinance plaintiff's property could be used for the construction of five single-family residences, much less than the number permitted before the ordinance was adopted. The court held that this satisfied the constitutional demand: there was no taking. It said that "the application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests ...," citing Nectow, or "denies an owner economically viable use of his land...," citing Penn Central. It acknowledged that "no precise rule determines when property has been taken" and *27 that "the question necessarily requires a weighing of private and public interest". 100 S.Ct. at 2141.
The California Supreme Court, from which the appeal to the United States Supreme Court was taken, held that damages could not be recovered even if the regulation constituted a taking; that the only remedy was invalidation. The Supreme Court refused to consider this issue, saying,
Because no taking has occurred, we need not consider whether a State may limit the remedies available to a person whose land has been taken without just compensation. [100 S.Ct. at 2143]
(7) San Diego Gas & Electric Co. v. San Diego, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981).
Plaintiff utility company owned 412 acres of land upon which it intended to construct a nuclear power plant. The City of San Diego rezoned part of the property, changing its classification from industrial to agricultural and designated it "open-space." The Gas & Electric Company sued. Its theory was inverse condemnation. The trial court found that plaintiff had been "deprived of all practical, beneficial or economic use of the property designated as open space, and has further suffered severance damage with respect to the balance of the subject property." Further, it held that "the property designated as open space and the remainder of the larger parcel is unmarketable in that no other person would be willing to purchase the property and the property has, at most, a nominal fair market value." It concluded that there was a taking for which just compensation must be paid under the constitution. Subsequent appeals through the state courts resulted in the conclusion that damages could not be recovered  that the only available remedy was invalidation of the ordinance. The United States Supreme Court was then asked to decide what it had refused to decide in Agins, namely, that compensation had to be paid when private property was taken for public use by regulation. It held, in a 5 to 4 decision, that no final judgment had been entered in California, and refused to address the taking issue. Justice *28 Rehnquist, however, in a concurring opinion, said that he would have agreed with the dissent, absent the final judgment question.
The dissent by Justice Brennan argued that a final judgment had been entered; that the case should be considered on the merits. The dissenting opinion held that there could be as much of a "taking" by police power regulation, e.g., a zoning ordinance, as by formal condemnation.
In my view, once a court establishes that there was a regulatory `taking' the Constitution demands that the government entity pay just compensation for the period commencing on the date the regulation first effected the `taking', and ending on a date the government entity chooses to rescind or otherwise amend the regulation.
He believed that once a taking has occurred, the constitutional provision which requires compensation is self-executing and compensation must be awarded; and further, that a temporary regulatory taking is no less of a constitutional taking. He disagreed with the California rule; he would not limit relief to invalidation. Since Justice Rehnquist announced his agreement with the dissent, absent the procedural question, it would appear that 5 of 9 Supreme Court Justices shared Justice Brennan's philosophy. Nevertheless, his dissent is not yet law.

B. New Jersey Decisions

(1) Kozesnik v. Montgomery Tp., 24 N.J. 154 (1957).
A zoning ordinance denied all use of the plaintiffs' property. This was held to be confiscatory and the ordinance was invalidated.
(2) Plainfield v. Middlesex Borough, 69 N.J. Super. 136 (Law Div. 1961).
Property was zoned for school, park or playground use only. The court held that for all practical purposes its value was destroyed, that a taking had occurred. It is not clear from the opinion, but it appears that the ordinance was set aside.

*29 (3) Morris Cty. Land v. Parsippany-Troy Hills, 40 N.J. 539 (1963).
The municipal zoning ordinance severly restricted the use of swamp lands. The court found that its practical effect was to appropriate private property for a flood water detention basin or open-space  a taking. It said:
While the issue of regulating as against taking is always a matter of degree, there can be no question but that the line has been crossed where the purpose and practical effect of regulation is to appropriate private property for a flood water detention basin or open space. [at 555]
........
The same result [confiscation] ordinarily follows where the ordinance so restricts the use that the land cannot be practically utilized for any reasonable purpose or when the only permitted uses are those to which the property is not adapted or which are economically infeasible. [at 557]
........
It is quite impossible or at least impracticable even if a proper function or responsibility of a court, to attempt to sift any wheat from the chaff and pick out certain uses or certain land reclamation provisions which might individually be valid. That which thereby could be saved would be so fractional and incomplete as not to amount to a comprehensive, reasonable regulation of the area. Therefore, we must hold the provisions invalid in their entirety. [at 559]
The court struck down the zoning regulation but delayed its judgment for a reasonable time to permit the enactment of a new ordinance. (In a footnote (at 556) it excluded flood plain regulations from the scope of its opinion.)
(4) Harrington Glen v. Leonia, 52 N.J. 22 (1968).
An undersized lot was zoned into idleness. The cause was remanded for reconsideration of a variance, with instructions to weigh the matter of confiscation, in connection with which the court said:
There is nothing in the out-of-state cases which denies recognition to the principal that in its ordinary operations, government would be seriously hampered if to some extent certain values incident to property could not be diminished without payment. Obviously, some values are enjoyed under implied limitation and must yield to the police power. But the extent of a particular diminution must be considered in determining its propriety. And the cited cases suggest that when diminution reaches a certain degree, certainly when it *30 unreasonably renders the property useless for practical purposes, as by zoning restrictions, an exercise of eminent domain is called for and compensation must be paid. [at 33]
(5) Lomarch v. Englewood, 51 N.J. 108 (1968).
A municipality, as permitted by statute, reserved plaintiff's land for one year for a park and for other public purposes. The Supreme Court construed the Official Map Act, under which the municipality acted, as requiring compensation, thus upholding its constitutionality. The reservation was treated as an option to purchase. Defendant was required to pay plaintiff the value of the option, including taxes paid for the year. Value was to be established by expert opinion.
(6) East Rutherford Industrial Park v. State, 119 N.J. Super. 352 (Law Div. 1972).
The Hackensack Meadowlands Development Commission, anticipating condemnation, refused subdivision approval for plaintiff's property. Warehouse construction was restrained. The court held that this was not a taking which would permit any immediate relief. It noted that the property owner could argue the question of damages when the condemnation action was commenced.
(7) A.M.G. Associates v. Springfield, 65 N.J. 101 (1974).
The local zoning ordinance caused plaintiff's lot to straddle two zones, making the rear portion unusable. The court said:
... in the split lot situation, an owner cannot validly be deprived of all reasonable utilization, for the benefit of another private land owner, of that portion of his land (beyond a de minimis situation) which otherwise, by reason of inability to meet the requirements of the zone in which it is situate, is practically unusable, yet remains subject to the burden of taxation. [at 111-12]
The court revised the ordinance, permitting the use of the rear portion of the lot for parking purposes. The court also noted:
The approach to the taking problem, and the result, may be different where vital ecological and environmental considerations of recent cognizance have *31 brought about rather drastic land use restriction in furtherance of a policy designed to protect important public interests wide in scope and territory, as for example, the coastal wetlands act ... and various kinds of flood plain use regulation. Cases arising in such a context may properly call for a reexamination of some of the statements ten years ago in the largely locally limited Morris County Land case. [fn. 4 at 112]
(8) Cappture Realty v. Elmwood Park Bd. of Adj., 133 N.J. Super. 216 (App.Div. 1975).
A moratorium prohibiting construction in a flood-prone area was not a taking, provided the municipality implemented its zoning ordinance as proposed and completed its planned flood control project within a reasonable time.
(9) Sands Point Harbour v. Sullivan, 136 N.J. Super. 436 (App. Div. 1975).
The Wetlands Act was challenged as an unconstitutional taking of plaintiff's property. The only absolute prohibitions under the act covered dumping solid waste, discharge and storage or application of pesticides. It authorized regulated activities. The court said:
Regulation of the use of marshes and wetlands having environmental and ecological importance to the continued existence of species of wildlife and to mankind is a valid exercise of governmental power. [at 439]. [It dismissed the complaint because] It has not been demonstrated, as was done in the Morris County Land case that no practical use can be made of plaintiff's property. [at 441]
(10) Washington Market Enterprises v. Trenton, 68 N.J. 107 (1975).
The city's declaration of blight caused a substantial deterioration in the value of plaintiff's office building. Rents decreased from $160,000 to $6,300 annually. The court held that the threat of condemnation, an expected consequence of the blight designation, effectively destroyed beneficial use. A taking has occurred. Damages were held to be the proper remedy. The court said (at 123), "Generally speaking condemnations should be ordered only where eventual acquisition appears inevitable ... or where equitable considerations mandate that remedy."
*32 (11) Schnack v. State, 160 N.J. Super. 343 (App.Div. 1978).
The threat of condemnation by the State was held not to effect a taking. The property continued to have value with a potential for increase. The court said:
... our inquiry must be whether the threat of condemnation has destroyed the landowner's ability to derive a reasonable benefit from his property. [at 348]
........
... it is generally held that governmental regulation which effectively deprives an owner of all reasonable uses of his property amounts to a compensable taking. [at 349]
........
... the holding in Washington Market clearly contemplates a reduction in value of a piece of property to "near zero" as a result of the actions of the condemning authority before a land owner is entitled to compensation. [at 350]
(12) American Dredging Co. v. State, 161 N.J. Super. 504 (Ch.Div. 1978).
An order made pursuant to the Wetlands Act prohibited the dumping of dredge spoils on 80 acres of plaintiff's land. The court held that the diminution in value was not sufficient to cause a taking. It said:
Where the effect of the governmental prohibition against use is not in the furtherance of a governmental activity, such as flood control or preservation of land for a park or recreational area, but rather to preserve the land for ecological reasons in its natural environment without change, the consideration of reasonableness of the exercise of police power must be redetermined. [at 509]
The issue was said to be: which interest prevails, the public interest in stopping despoilation or the private interest in using property? The difference between legislation promoting public good and that designed to prevent public harm was stressed. It found that the public interest outweighed the private loss.
(13) Usdin v. Environmental Protection Dep't, 173 N.J. Super. 311 (Law Div. 1980), aff'd 179 N.J. Super. 113 (App.Div. 1981).
A flood control regulation, later abandoned, prevented the use of plaintiff's property. Plaintiff sought damages. Held: The *33 test of taking is to be found in the purpose of the regulation. "If the purpose of the restriction was to prevent an abuse and the restrictions are reasonably related to that end, the act of restricting is a proper exercise of police power." (At 329). But, "if the environmental restriction is to impart a public benefit, that is, to create a new enjoyment for citizens which, although not required, is nevertheless desirable, or to enhance the usefulness of other lands, the suffering freeholder may very well have justifiable cause to complain."

C. Conclusions to be Drawn from the Cases

(1) The Federal Decisions

The United States Supreme Court decisions provide little precedential help in the present case. They underline the fact that a regulation may effect a taking but acknowledge that the facts of each case must determine the question of whether it has gone too far. Helpful analyses are supplied by Agins and San Diego, but they establish no final rules of use here. Penn Central v. New York, supra, a case with unique facts, held that the test of a "taking" was whether there was a deprivation of all reasonable return on the value of the property. That rule is echoed in the New Jersey cases.

(2) The New Jersey Decisions

The New Jersey rule, while expressed differently in different cases, is set forth most clearly in Morris County Land v. Parsippany-Troy Hills, where it is said that a taking occurs when:
... the ordinance so restricts the use that the land cannot practically be utilized for any reasonable purpose or when the only permitted uses are those to which the property is not adapted or which are economically infeasible. [40 N.J. at 557]
AMG Associates referred to property as being "practically unusable." Washington Market referred to an effective destruction of beneficial use, which Schnack interpreted as requiring a reduction in value to "near zero." These are the tests to be applied here with respect to plaintiffs' taking arguments. Temporary *34 regulation may be sufficiently comprehensive to constitute a taking, as held in Lomarch. Further, the purpose of the regulation, considered in American Dredging and Usdin, is a factor in deciding whether it is excessive; if the regulation is designed to prevent public harm it is a permissible exercise of the police power, while the contrary is true if the purpose is to confer a public benefit.[1] A case-by-case approach is required. The entire setting in which the property is found and the total effect of the regulation upon its use must be considered. In the present case plaintiff, in addition to the taking claim, argues that Evesham's ordinances are unreasonable, denying due process and equal protection. These issues are addressed first; conclusions reached with respect to them support the ultimate determination of the taking claim.

III. The Zoning Ordinances  Their Validity Apart From the Taking Question

A. Due Process

Due process requirements for zoning ordinances are set forth in Home Builders League of So. Jersey, Inc. v. Berlin, 81 N.J. 127 (1979):
Validity of a zoning ordinance is determined by testing it against certain well-established criteria. First, the statute must authorize the municipality's exercise of the power in question. Guidelines which should be observed are that the provisions are presumptively valid, the wisdom or advisability of the enactment is properly a legislative function, and laws granting authority to municipalities should be construed broadly and liberally. Second, there are constitutional constraints which must be observed. Zoning, reflecting as it does the exercise of the police power, is subject to due process requirements. Arbitrary or unreasonable zoning ordinances cannot stand. The purposes sought to be accomplished must justify the restrictions placed upon the use of one's land. The means used to obtain the ends must be reasonably related to those ends. [at 137; citations omitted]
In Harrington Glen, supra, the court said:
... reasonable zoning regulations designed to promote the orderly physical development of a municipality according to a land use pattern represent a valid exercise of police power. Of course, such regulations, by establishing districts *35 wherein land may be devoted only to certain specified uses, impose restrictions on the ordinary incidents of ownership. But the restrictions are not offensive constitutionally because when reasonable in degree and, in the judgment of the governing body, necessary to the physically harmonious growth of land use in the municipality, they serve the overall public interest of the community. [52 N.J. at 32]
Ecological concerns must be substantial in order to support the adoption of regulations such as the EP-1 ordinance here in issue. The rule is set forth in Southern Burlington Cty. N.A.A.C.P. v. Mount Laurel, 67 N.J. 151:
This is not to say that land use regulation should not take due account of ecological or environmental factors or problems. Quite the contrary. Their importance, at last being recognized, should always be considered. Generally, only a relatively small portion of a developing municipality will be involved, for, to have a valid effect, the danger and impact must be substantial and very real (the construction of every building or the improvement of every plot has some environmental impact)  not simply a make weight to support exclusionary housing measures or preclude growth  and the regulation adopted must be only that reasonably necessary for public protection of a vital interest. Otherwise, difficult additional problems relating to a "taking" of a property owner's land may arise. [at 186-187]
In Katobimar Realty Co. v. Webster, 20 N.J. 114 (1955), the court said:
Use restrictions upon real property must find their justification in some aspect of a police power, reasonably exerted for the public welfare ... But it is basic to zoning, as with every exercise of the police power, that it be contained by the rule of reason; constitutional due process and equal protection ordain that the exertion of the authority shall not go beyond the public need; there cannot be unnecessary and excessive restrictions upon the use of private property or the pursuit of useful activities; a substantial intrusion upon the right infringes essential individual liberties immune to legislative interference. The restrictions may be so unreasonable as to be confiscatory, and the regulation then transgresses the organic law as arbitrary and oppressive.
........
The constitutional principles of due process and equal protection demand that the exercise of the power be void of unreason and arbitrariness, and the means selected for the fulfillment of the policy bear a real and substantial relation to that end.
........
The genius of the constitutional and statutory zoning process is the regulation of land and buildings by districts according to the nature and extent of their use; and it goes without saying that arbitrary deviation from the general rule is forbidden, on constitutional principle as well as the policy of the statute. Undue discrimination in treatment and classification vitiates the regulation. [at 122-123]
*36 In Roselle v. Wright, 21 N.J. 400, 410 (1956), the court, speaking of the police power in zoning matters, said: "Constitutional uniformity and equality requires that classification be founded in real and not feigned differences having to do with the purposes for which the classes are formed." The old zoning statute referred to in Katobimar, N.J.S.A. 40:55-30, 31 and 32, required zoning by districts in accordance with a "comprehensive plan." The Municipal Land Use Law does not contain this language. Instead, it permits, without requiring, the adoption of a master plan which "shall generally comprise a report or statement and land use development proposals...." N.J.S.A. 40:55D-28. When such a plan has been adopted, the governing body of the municipality is required to enact a zoning ordinance which must be "substantially consistent with the land use plan element of the master plan or designed to effectuate such plan element," unless the governing body adopts an inconsistent ordinance or amendment by a majority of the full membership with reasons recorded. N.J.S.A. 40:55D-62. This section requires the ordinance to be drawn "with reasonable consideration to the character of each district and its peculiar suitability for particular uses and to encourage the most appropriate use of land." It also stipulates that the regulations in the ordinance must be "uniform throughout each district for each class or kind of buildings or other structures or uses of land...." This language reflects the requirements of Art. IV, § 6, par. 2, of the New Jersey Constitution (1947) which permits zoning by district and the regulation of "buildings and structures according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land...." A classification unsupported by public purpose or other valid distinction is discrimination which is contrary to both Constitution and statute. See Roselle, supra at 409.
Plaintiff's property, as a result of the EP-1 zoning, is an island surrounded by permitted commercial and residential uses. Its condition is strikingly similar to that described by the court *37 in Odabash v. Dumont, 65 N.J. 115 (1974), in which it was held that
The prohibition against further garden apartments is unconstitutional as applied to plaintiff's property because the immediate area is so studded with apartment and business uses, leaving it as an isolated island, that it could not reasonably be used for single family dwelling purposes and to so require would be arbitrary. [at 123]
The court then addressed the validity of the ordinance and said:
It was early established in the zoning law of this state that when an ordinance amendment changes use restrictions applicable to an area, and there had been a predominate utilization of the immediate area for the formerly permitted and now prohibited use, the amendment may well be invalid, as arbitrary and unreasonable, as applied to parcels which had not previously been so used. The especially relevant thesis running through our cases in this field of the law is that the test of invalidity is not necessarily the complete unusability of the property involved for the now permitted uses, but rather whether, in view of the extent of the now prohibited uses in the close vicinity of the parcel, its value will be substantially depreciated and its marketability greatly impaired if the prohibited uses are not allowed. The answer must depend upon the peculiar facts in each case. [at 123-124]
The Sheerr tract is closely associated with large residential developments and with a hospital having related facilities which are at least semi-commercial. While the "predominate utilization of the immediate area" may be debatable, the Odabash language is clearly relevant to the present discussion.

B. The PPR Zoning Regulation

This regulation was clearly a denial of due process and equal protection. The Sheerr tract was the only private land in the township so zoned. The ordinance denied any private use of the property. Its purpose was to create a public benefit  the establishment of a public park and recreation area for the community. All economic return from the property was prevented. No factual basis for the zoning classification existed. The ordinance was therefore grossly arbitrary. It became effective on January 16, 1979 and remained in force until June 1980[2] when legally sufficient EP-1 legislation was adopted.

*38 C. The EP-1 Zoning Regulation

As the following discussion shows, the EP-1 ordinance also lacks due process requirements.

(1) The Validity of the Factual Bases for the EP-1 Zoning.

Evesham's EP-1 zoning designation rests upon a theory of environmental protection. The property within that zone, according to the ordinance, was of "unique character by virtue of the presence of a beech and maple hardwood forest with many holly trees thereon, the function of the area as a natural replenishing of ground water and the function of the area as a natural habitat for birds and other wildlife." These bases for the adoption of the severe restrictions affecting the plaintiff's premises were demolished by plaintiff's expert witnesses and the admissions of the township officials.
The experts testified that the trees, while valuable, are not unique; at least four other areas in Evesham Township consist of similar woodlands but are not specially zoned for their protection. The authorized conditional uses include lakes, playgrounds, athletic fields, residences and business establishments; these would require the removal of many trees, a circumstance which challenges the sincerity of the announced concern about trees. Indeed, the EP-1 ordinance permits 60% of the land to be occupied by buildings and impervious surfaces. The planned by-pass would also destroy a substantial amount of vegetation. The defense expert, while describing plaintiff's woodland as a rare "climax" forest which would last indefinitely, admitted that it would be dominated by ordinary oak trees and that site plan review was the normal process with which to achieve tree preservation.
The premises are of modest size for a bird and wildlife habitat. Commercial and residential development around the property, as well as the major highway and proposed by-pass, offer considerable discouragement to birds and wildlife. The township's mayor testified that the property could not long *39 survive as a natural habitat because of traffic conditions and the proposed by-pass.
The ground water replenishment capacity of the property is minuscule, although protection of this water supply source was said to be a prime concern in adopting the EP-1 zoning. The aquifer supposedly recharged by plaintiff's property is the Kirkwood, which has a surface area of 70,400 acres, of which 7,680 acres lie within Evesham Township. Plaintiff's EP-1 zone constitutes only .008% of the aquifer's total outcrop area (the outcrop being the point where the aquifer reaches the surface of the earth) in Burlington County. The silty land comprising much of the soil in the EP-1 zone retains water at high levels, so that all of it does not go into the aquifer. Most of the property's surface water runs into neighboring water sheds. An additional and substantial amount of water is absorbed by the trees and other vegetation on the property. The largest aquifer in South Jersey is the Cohansey, which lies above the Kirkwood and supplies 90% of the latter's water recharge. The Kirkwood receives only 10% of its water from its outcrop area; arithmatically, therefore, plaintiff's property contributes only.0008% (.008% X .10%) of the water entering the aquifer through its outcrop area. There is no factual basis supporting the claimed need to design special zoning restrictions for plaintiff's property in order to assure the replenishment of ground water supplies; its function in that respect is too insignificant.
The environmental concerns of the township, which provided the only possible basis for the unique zoning treatment of the Sheerr property, therefore prove to be illusory. The test set forth in Home Builders League, supra, has not been met. In that case the Supreme Court said (at 137) that "The purposes sought to be accomplished must justify the restrictions placed upon the use of one's land ... The means used to obtain the ends must be reasonably related to those ends."
Here, since the environmental concerns are absent, the stated environmental purposes cannot be accomplished by the restrictions and there can be no connection between ends and means.

*40 (2) The Unique Treatment of the Property

Plaintiff's property is the only property in the entire township now zoned EP-1. No other property owner in Evesham has been required to obtain a conditional use permit from the planning board before using his property for any purpose. The design criteria in the ordinance, which constitute the "specifications and standards" required by § 67 of the Municipal Land Use Law, necessarily apply only to the Sheerr tract. Their references to trees, aquifer, green acres and highway frontage are tailored to fit that tract. The conditional use restrictions are superfluous. They erect an unnecessary hurdle. Every conditional use could have been made a permitted use; the design criteria would have been taken into consideration in connection with every site plan and subdivision application affecting the property, thus providing the same protection as a conditional use application. Only exceptional circumstances, involving the promotion of the general welfare of the community, can support the singling out of plaintiff's property in this manner. As shown in the discussion above, those circumstances are not present. Consequently, the application of the zoning ordinance to plaintiff's property is unreasonable and arbitrary.

(3) The Relation of Plaintiff's Property to its Neighbors

Prior to the adoption of the township's new zoning ordinances in 1979 and thereafter, plaintiff's property had been zoned partly for commercial and partly for residential uses. These uses, with certain changes of no importance here, have been continued for all of the properties surrounding the Sheerr EP-1 zone with the exception of one small parcel, formerly owned by the Bank of New Jersey, also zoned EP-1. As the result of litigation, the zoning of that small parcel has now been changed to a commercial classification. Lands across the highway from Sheerr are zoned for commercial uses although they differ little from plaintiff's property in terms of topography and vegetation. Route 73 is a busy state highway. The master plan advances highway commercial uses as appropriate for the frontage across *41 the highway from plaintiff's property and to the north and south of her property. Even in the EP-1 zone, commercial uses are theoretically possible, subject, however, to severe restrictions. The separation of the Sheerr property from its neighbors is said to be justified by its environmental sensitivity. That claim, addressed above, is not supported by the facts. Consequently, there is no basis for treating the plaintiff's property any differently than those properties which surround it.

(4) The Bank of New Jersey Transaction

The Bank of New Jersey owned a 4.6-acre parcel of land adjoining plaintiff's EP-1 property; the parcel fronts on Route 73 and was also zoned EP-1. The bank filed a suit, later consolidated with these proceedings, alleging claims similar to those advanced here. Before trial the bank entered into a settlement arrangement with the township in which the Sheerr plaintiffs did not participate.
That settlement, reduced to an order of this court, provided that the EP-1 restrictions were inapplicable to the Bank's lands because of "the exceptional narrowness, shallowness and shape of the Bank's property and by reason of the inability of the Bank to utilize the transfer development rights provision of Ordinance No. 94-79 (bonus provisions)...." The township agreed to "rezone" the bank's lands as CH-5 (Highway Commercial) and made the following concessions:
(a) The five-acre minimum lot size requirement was waived.
(b) Side yard and rear yard requirements were waived.
(c) Height limitations were relaxed.
(d) The "preservation" designation of the bank's lands on the master plan and official map were removed and the lands were to "no longer be subject to acquisition by the Township."
The bank agreed to provide the township with certain restrictive covenants which protected trees and promised that not more than 60% of the site would be covered by any impervious surface, while 40% should be maintained as green area. Nevertheless, the township agreed that the buffer of trees along *42 Route 73 could be staggered at an average depth of 40 feet, with a minimum depth of 25 feet (instead of the 100 feet required by the EP-1 zoning regulation). Furthermore, the township permitted the removal of trees within this buffer area for the installation of storm drainage ponds, improvements and access ways. Installation of disposal systems was permitted in the buffer area.
As a consequence of this settlement, plaintiff's property became the only property in Evesham Township designated EP-1, an isolation considerably emphasized by the special treatment provided for the bank's adjacent lands, which, from the standpoint of environment, topography and location were no different than the lands of Sheerr. Once again, in the very course of this litigation the township emphasized its insistence upon the discriminatory treatment of plaintiff's property.

(5) The Restriction of the Land to Conditional Uses Only

Plaintiff's EP-1 lands were provided with no permitted uses. Only conditional uses, of a limited nature, were allowed. Conditional uses are defined in N.J.S.A. 40:55D-3 as:
... a use permitted in a particular zoning district only upon a showing that such use in a specified location will comply with the conditions and standards for the location or operation of such use as contained in the zoning ordinance, and upon the issuance of an authorization therefore by the planning board.
They are authorized by N.J.S.A. 40:55D-67:
A zoning ordinance may provide for conditional uses to be granted by the planning board according to definite specifications and standards which shall be clearly set forth with sufficient certainty and definiteness to enable the developer to know their limit and extent.
N.J.S.A. 40:55D-70 permits boards of adjustment to grant variances for conditional uses. The Municipal Land Use Law does not specifically provide for any limitation of property to conditional uses only. Plaintiff argues that such limitation is not permissible. She points to N.J.S.A. 40:55D-62, which requires zoning enactments to reflect "reasonable consideration for the character of each district and its peculiar suitability for particular uses." (Emphasis supplied).
*43 She says that conditional uses must be considered in relation to permitted uses, as illustrated by Tullo v. Millburn Tp., 54 N.J. Super. 483 (App.Div. 1959). This case dealt with "special exceptions," a term equivalent to "conditional uses" under our present statute. Darrell v. Clark, 82 N.J. 426, 428 (1980). In Tullo it was said that the philosophy underlying special exceptions was that
... certain uses, considered by the local legislative body to be essential or desirable for the welfare of the community and its citizenry or substantial segments of it, are entirely appropriate and not essentially compatible with the basic uses in any zone (or in certain particular zones), but not at every or any location therein or without restrictions or conditions being imposed by reason of special problems ... [54 N.J. Super. at 490-491; emphasis supplied]
Tullo, however, was decided under the old zoning law which gave boards of adjustment, under N.J.S.A. 40:55-39b, power to hear and grant requests for special exceptions, provided relief was conditioned upon a showing that they could be granted without substantially impairing the intent and purpose of the zone plan and the zoning ordinance. Consequently, a "plan" was necessary with respect to any area affected by the special exception and that plan had to be considered when dealing with an application for such an exception. Verona v. West Caldwell, 49 N.J. 274, 283 (1967).
The Municipal Land Use Law contains entirely different provisions with respect to conditional uses. Section 67 of the law, quoted above, authorizes zoning legislation for conditional uses, merely requiring "definite specifications and standards." The old requirement that such uses conform to the intent and purpose of the zone plan and the zoning ordinance is gone. This is logical: a conditional use is really a permitted use subject to conditions (like most permitted uses) and therefore constitutes a part of the zone plan.
This conclusion is not affected by other statutory provisions relating to conditional uses. N.J.S.A. 40:55D-70 (the source of which was N.J.S.A. 40:55-39b) no longer refers to "special exceptions" and merely permits, in § 70c, the allowance of a variance for a conditional use. Consequently, it subjects that *44 allowance to the same conditions as any other variance, one of which is that it "will not substantially impair the intent and purpose of the zone plan and zoning ordinance." Thus, it is only in connection with a variance application that a "plan" must be considered. Section 76b permits a board of adjustment to grant a conditional use approval (as opposed to a variance) "to the same extent and subject to the same restrictions as the planning board." This does not subject the grant to a test of zone plan impairment. Other provisions in the new law simply enlarge the authority of the planning board when considering conditional uses without otherwise affecting the elementary restrictions of § 67 requiring only "definite specifications and standards." See N.J.S.A. 40:55D-51, 60 and 65f.
It follows that the restriction of plaintiff's property to conditional uses only is authorized by our present zoning statutes. Evesham's ordinance provides "definite specifications and standards." Consequently, it survives the argument that it is without legislative authorization.
An examination of the conditional uses themselves, however, requires a different conclusion. As the following analysis shows, they represent arbitrary legislation.

(a) Residential Use

The ordinance permits the construction of residences on five-acre lots. All of the expert witnesses, including the planner presented by defendant, testified that the five-acre restriction made this an impractical use for the property  that it was one which would never occur. It is therefore an unreasonable regulation which will not be sustained by our courts. For example, a 40,000 square foot minimum residential lot requirement was held invalid in Schere v. Freehold Tp., 119 N.J. Super. 433 (App.Div. 1972), certif. den., 62 N.J. 69 (1972), cert. den. 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973), when expert testimony showed that lots of that size could not be sold. The character of Evesham Township is not similar to that considered *45 in Fischer v. Bedminster Tp., 11 N.J. 194 (1952), where five-acre minimum lot sizes were held to be permissible because they were common throughout the municipality. A zoning ordinance must give consideration to the character of a zoning district and the suitability of that district for particular uses. Raskin v. Morristown, 21 N.J. 180, 198 (1956). Evesham's ordinance ignores these requirements.

(b) Private Recreational Uses

The ordinance permits:
Private recreational areas such as camps, golf courses, playgrounds, athletic fields, lakes, picnic areas operated for profit or hire when authorized as a conditional use....
All of these uses require the removal of a substantial number of trees, frustrating a central purpose of the EP-1 designation. Most would require substantial fill, adversely affecting cost and destroying vegetation. Lakes need a water source; the Sheerr property has no stream running through it, and no evidence of any other adequate source of water was produced. A lake would require extensive excavation and tree removal. The defense planning expert admitted that an 18-hole golf course was not foreseeable, suggesting a driving range or a "chip-n-putt" operation. He thought that some kinds of camps were possible  for example, tennis camps. Any of these uses would destroy the prospect of preserving the property as a wildlife habitat.
It is obvious that the conditionally permitted recreational uses are at best marginal, inserted in the ordinance as a gloss, designed to provide an argument that the property has not been taken. They are not realistic and are therefore unreasonable.

(c) Commercial Uses

The ordinance conditionally permits a number of commercial uses, but only on five-acre lots. All witnesses agreed that a single retail store, or a restaurant, or a theater, or any of the other commercial uses listed, would be little interested in a *46 five-acre location. The size requirement is prohibitively large. There is, however, the possibility of several retail units being constructed on a single lot under single or joint ownership. Its planner believed this kind of use ought to be encouraged.
Standing alone, the five-acre commercial restriction would not be fatal. It offers the possibility of use. The presumption of legislative validity would prevail, if the five-acre limitation presented the only hurdle. It does not. The use is conditional, requiring an extra planning board application, not demanded when a permitted use is undertaken. A set-back of 100 feet from the Route 73 right-of-way line is required, thus placing a commercial building considerably more than 100 feet from the traveled portion of the highway. Every lot must have 400 feet of frontage. Curb cuts are limited and reverse parking is required. There may not be any "disturbance of the trees, natural terrain, ground cover or vegetation ... for any purpose other than the construction of access roads." Thus, on the Sheerr tract, a commercial building would be hidden from view, substantially detracting from its business prospects. The view will worsen as vegetation continues to grow. "Preservation of the aquifer recharge area" is required, although concern for this water source, as seen above, is unreasonable. The construction of a commercial building, with parking space, would require tree removal, contrary to one purpose of the ordinance. Wildlife would be disrupted.
The ordinance prohibits an impervious covering of more than 60% of a lot area. At least 40% must be maintained as open space. Parking space is required in the ratio of not less than two square feet for each square foot of a building's gross floor area; thus, twice the area devoted to a one-story building must be reserved for parking. These provisions translate into 40% green area, 40% parking area, and 20% building area. They represent severe construction restrictions, while negating the township's claimed concern about trees and wildlife since they permit 60% of any lot to be occupied by buildings and parking space.
*47 To sum up: The only realistic possibility for the use of plaintiff's property, among the conditional uses permitted, is a commercial use. That use may be undertaken, however, only by a purchaser who is willing to:
(a) Acquire at least five acres of land with not less than 400 feet of frontage.
(b) Limit construction of buildings to 20% of the land area.
(c) Block the view of his commercial undertaking with a 100-foot-wide strip of trees and other vegetation.
(d) Accept the burden of obtaining a conditional use permit as well as subdivision and site plan approvals.
(e) Obtain a permit for tree removal.
(f) Comply with the requirements for:
(1) Minimizing tree removal
(2) Preserving the aquifer
(3) Minimizing fill
(4) Limiting curb cuts to one for each 400 feet of frontage which is 150 feet from property lines
(5) Reverse parking
(g) Wait for one year after receiving final approval to determine whether the Township will acquire the property.
These restrictions upon commercial activity, taken together, are unique to plaintiff's property in all of Evesham Township. They make the likelihood of any of the conditionally permitted uses of plaintiff's property very remote, thus reflecting arbitrary action.

(6) The Bonus

Defendant municipality attempts to alleviate the restrictions of its EP-1 zoning ordinance by providing a development "bonus." This provision permits the construction of additional floor space (as opposed to use of larger land areas) on lands contiguous to an EP-1 zone in exchange for enlarging the open spaces to which the EP-1 lands are subjected. In accordance with these regulations plaintiff, by maintaining 50% (instead of 40%) of her EP-1 lands as "green area" could develop on her contiguous land an additional 10% of floor space. The maintenance of 70% to 100% green area would entitle her to a 25% floor space bonus. The ordinance requires that the contiguous land be "less environmentally sensitive" (a term which the ordinance does not define) and lie within 1,200 feet of the "Route 73 right-of-way *48 line." Plaintiff is the only land owner in Evesham Township whose property is affected by the bonus provision.
The term "bonus" is a misnomer. The permitted extra floor space would be available to plaintiff only upon the surrender of a substantial amount of her EP-1 lands. The acquisition of 10% to 25% more floor space in exchange for 10% to 60% of all of plaintiff's land cannot be described as a "bonus." There is also uncertainty as to the application of the percentages. It appears that plaintiff would be obliged to surrender all of the required additional open space at the time the first building is constructed on contiguous land.
In the context of this case, the significance of the bonus arrangement lies in its revelation of intent. Once again the governing body of the Township has said that it wants this property preserved for the benefit of the public. The bonus offers no genuine attraction to the plaintiff or to a developer. It is a transparent effort to confer some supposed benefit upon the property which will blunt an anticipated "taking" claim. The benefit is illusory and the effort unsuccessful.

IV. The Tree Ordinances

The township adopted and amended an ordinance regulating the removal of trees and shrubs and establishing provisions for their protection and preservation. Permits must be obtained before trees and shrubs may be removed. Plaintiff contends that such regulations have been preempted by the State. She points to N.J.S.A. 13:1B-1 et seq., which creates the Division of Parks, Forestry and Recreation, within the Department of Conservation and Economic Development (now the Department of Environmental Protection). Section 15.5 vests the Department with the responsibility of "acquiring, maintaining and preserving natural areas within the State as a habitat for rare and vanishing species of plant and animal life...." The statute does not deal with the removal of trees and shrubs on private lands; this responsibility falls upon the Department only after forest land has been acquired by the State. This *49 interpretation is underlined by § 15.6 which authorizes the Division to "recommend the acquisition of specific lands or interests in lands which are suitable for natural areas," and § 15.9 which deals with techniques for the acquisition of lands. The Evesham Township tree ordinance does not conflict with this state law. It is not an obstacle to the accomplishment of the purposes of the legislation: the statute is in no sense exclusive in the field, is not dealing with a subject matter reflecting a need for uniformity and is not part of any state scheme which is so pervasive as to preclude the coexistence of municipal regulation. These criteria must be found in order to establish preemption. Overlook Terrace Mgt. Corp. v. West N.Y. Rent Control Bd., 71 N.J. 451, 461 (1976).
The ordinance does not prohibit the removal of shrubs and trees, it only requires a permit for that purpose. Standards for the granting or denial of a permit are set forth at length and are reasonable.
The tree legislation was not adopted by virtue of any zoning power. No statute delegates specific authority for these enactments. Consequently, authorization if any, must be found in N.J.S.A. 40:48-2 which provides:
Any municipality may make, amend, repeal and enforce such other ordinances, regulations, rules and by-laws not contrary to the laws of this state or of the United States as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants, and as may be necessary to carry into effect the powers and duties conferred and imposed by this sub-title, or by any law.
Our Constitution requires that laws concerning municipalities be construed liberally in their favor. N.J.Const. (1947) Art. IV, § VII, par. 11. "Nevertheless, the power is restricted to those matters which are of purely local concern, and even where the State Legislature has not spoken, some matters, inherently in need of uniform treatment, are not a proper subject for municipal legislation." In re Public Service Elec. & Gas Co., 35 N.J. 358, 370 (1961) (striking down the attempted municipal regulation of a public utility). The preservation of shrubs and trees, *50 affecting the public interest in soil erosion, ground water retention and esthetics, is a proper local concern. In State v. Gallop, 103 N.J. Super. 367 (App.Div. 1968), the court approved a provision in a zoning ordinance which required the planting and maintenance of trees in a buffer zone. See, also, McQuillin, Municipal Corporations, §§ 30.66, 24.95, 15.32, 30.67, 24.14, 24.15 (1980). The legislation is presumptively valid. Nothing has been presented here which overcomes that presumption.
From plaintiff's standpoint, however, the ordinance, though valid, adds further restrictions to those already imposed upon this property, thereby decreasing the likelihood of its use for any practical purpose.

V. The Official Map

On April 17, 1979 Evesham adopted an official map for the township. It designated certain areas as "proposed preservation." Defendant's planning expert, who prepared the map, testified that "preservation" areas were no different than "reservation" areas under the Municipal Land Use Law. He said that the lands shown on the map were intended to be kept under natural cover and acquired by the township or controlled through flood plain or development regulations. Plaintiff's property was among those areas so designated. Furthermore, that property was designated on the master plan as "park or preservation area." N.J.S.A. 40:55D-44 provides:
If the master plan or the official map provides for reservation of ... public areas within the proposed development, before approving a subdivision or site plan ... The planning board may reserve the location and extent of ... such ... areas for a period of 1 year after the approval of the final plat....
The "preservation" designation of plaintiff's property was removed from the official map in June 1980 but the master plan continues its classification as "park or preservation area." Thus, the township erected an additional substantial hurdle to the development of the property. Any developer would be obliged to incur the time and expense of preparing plans and applications for planning board approval, knowing that, if approval was obtained, the township might nevertheless reserve the property *51 for an additional year and then acquire it. While the statute entitles the developer "to just compensation for actual loss found to be caused by such temporary reservation and deprivation of use," that prospect provides little encouragement to a developer who can be expected to find other sites to develop which entail less risk.
Aside from these concerns, the map designations underline once again the intent of the township to preserve the plaintiff's property in its natural state.

VI. Has a "Taking" Occurred?

Evesham's officials testified that they had no intention of taking plaintiff's property by regulation and did not expect to acquire it by condemnation. They did not think they could afford its purchase. Their words bear little resemblance to their actions. "[T]he Constitution measures a taking of property not by what a State says, or by what it intends, but by what it does." Hughes v. Washington, 389 U.S. 290, 298, 88 S.Ct. 438, 443, 19 L.Ed.2d 530 (1967) (Stewart, J., concurring).
When the governing body adopted the PPR ordinance designating plaintiff's land for park and recreation uses, they were advised by their solicitor that the ordinance presented constitutional problems. That advice did not prevent its adoption. The above analysis of the various ordinances affecting plaintiff's property and official activities during their adoption, clearly shows that their restrictive effect upon the EP-1 zone was too burdensome. An outline of the analysis is revealing:
(a) From January 1979 to June 1980 the property was classified for a purely public purpose: public park and recreation.
(b) Plaintiff's property is the only one in Evesham Township zoned EP-1, a classification based upon unsupportable ecological theories.
(c) The EP-1 designation denies plaintiff any permitted use of her property, allowing only conditional uses which are highly restrictive and unlikely to materialize.
(d) The EP-1 ordinance limits buildings to no more than 20% of the total area of the EP-1 zone while requiring 40% to be open space.
(e) The "bonus" system affects plaintiff's land and no other. It is a system which amounts to a forfeiture and not a bonus, if pursued.

*52 (f) Expert witnesses appeared at the public hearings, providing very pervasive information which showed that the factual bases for the adoption of the EP-1 ordinance were not valid. These opinions were ignored.
(g) In April 1979 the municipality adopted an official map which designated plaintiff's lands for "preservation," subjecting her to statutory provisions which permitted the township to reserve them for eventual acquisition, thereby making it unlikely that any one would be interested in developing the property. The official map was changed to delete the designation in June 1980 but the master plan continues to describe the property as "park or preservation."
(h) Tree ordinances restrict the right to cut and remove trees, adding further difficulties to any development of plaintiff's property.
(i) Design criteria, especially the requirements for a 100-foot set-back from the right-of-way within which no vegetation may be removed, make development a practical impossibility.
(j) The EP-1 ordinance is arbitrary, denying due process apart from taking considerations.
(k) The township has planned to build a by-pass highway through the property, which will significantly change its character.
These restrictive circumstances, municipal declarations and severe legislative effects produce a very clear result: they preserve plaintiff's property in its natural condition as open space, thus conferring a public benefit.
It might be argued that the regulations were designed to prevent the loss of a water supply, the loss of the visual enhancement of the property and the loss of wild life, thus qualifying as legislation designed to prevent public harm. Such legislation would be permissible under some of the reasoning of American Dredging Co. v. State, 161 N.J. Super. 504 (Ch.Div. 1978), and Usdin v. D.E.P., 173 N.J. Super. 311 (Law Div. 1980), aff'd 179 N.J. Super. 113 (App.Div. 1981). The courts in these cases upheld wetlands and flood control regulations. The trial courts distinguished a regulation conferring a benefit upon the public from one which prevented despoilation or abuse, contrary to the public interest, holding that the former was a taking, requiring compensation, while the latter was not. The Appellate Division, in Usdin, affirmed, but did not discuss this distinction, relying instead upon the conclusion that the police power was used properly when adopting legislation to control flood waters. Such legislation furthered the health, safety and general *53 welfare of the public. The benefit-conferring/abuse-preventing distinction presents problems because it is illusory. Most regulations resulting in taking claims could be described either way. For example, a zoning ordinance which restricts private property to use as a public park is clearly unconstitutional unless compensation is paid since a public benefit is conferred, but the ordinance also prevents abuse since it stops development and the consequent loss of open space. The proper test in a "taking" case is that set forth in Pennsylvania Coal Co. v. Mahon, supra: Does the regulation go too far; is it excessive?
Plaintiff's expert testified that the property, when zoned PPR, depreciated 90% in value, and that the remaining 10% represented only the price a speculator would pay. He believed a gambler could always be found who would purchase property for a nominal price. It was his opinion that the EP-1 zoning, being less restrictive, caused a value deterioration of 80%; however, he did not believe that any purchaser would be willing to buy the property, as zoned, for any development purpose. He agreed with plaintiff's planning expert that the EP-1 zoning was unreasonable, denying any practical use of the property. The valuation experts for both sides agreed that no comparable sales could be obtained on which to base appraisals of current value; no other property could be found with comparable zoning.
The defense expert testified that the property had only "nominal value" with PPR zoning. He agreed that the EP-1 zoning conditions, the tree ordinances and the official map/master plan restrictions reduced market value, but in his opinion only to 40% of prior value. Nevertheless, he shared the opinion of the defense planner that the EP-1 designation was reasonable  that it would not arbitrarily prevent the sale and use of the plaintiff's property.
Has there been a taking? It is clear that there has been with respect to the PPR designation. The PPR lands had no practical use potential. The fact, conceded by plaintiffs, that the land *54 had a speculative value equal to 10% of original value does not deny a taking. All land has some value to a speculator willing to gamble on change. Private property would be seldom protected from government greed if speculative value were the measure of due process. Diminution in value is a consideration but it is the denial of beneficial use (obviously affecting value) that counts most. When money value is considered, market value is the test; speculative value is not market value. Furthermore, the witnesses were not offered as experts as to speculative value; most expert testimony on that subject would be of doubtful validity because a foundation for the opinion would usually be lacking. In Lomarch, supra, the court required compensation when land was restricted to park use; no different result can follow here with respect to the PPR regulation.
The same rules must apply to the EP-1 zoning. The appraisal experts differ as to its effect, one claiming an 80% depreciation in value, the other 60%; the planning experts are equally divided, one claiming that the zoning makes the property unusable, the other that it does not. Both appraisal witnesses, in considering EP-1 restrictions, spoke in terms of market value. That value is usually measured by an analysis of comparable sales or by a capitalization of income. Here, however, there were no comparable sales and the property had no income usable for capitalization purposes. The experts admitted that they relied entirely on experience. Consequently, the opinions of market value were speculative, no more than educated guesses. They are of little value in deciding the taking question.
The opinions of the opposing planners and appraisers as to whether the EP-1 property could be marketed are subject to this court's analysis of all of the evidence. That analysis leads to the conclusion that the property has no potential for any practical use, therefore requiring the further conclusion that the EP-1 regulation constituted a taking. This ultimate conclusion does not ignore the problem of value diminution. It recognizes the fact that a very substantial loss of value has occurred, a loss which cannot be measured accurately, and therefore emphasizes *55 the other controlling fact, the loss of use. These approaches to the taking question are supported in our state and federal decisions.
Generally speaking, our cases do not deal in terms of dollars. While Schnack spoke of value reduction to "near zero" as being necessary, all of the other cases, including Washington Market, upon which Schnack based its observation, dealt in terms of practical nonutilization of property and economic infeasability. The only thing that can be said with certainty about the tests to be applied to determine whether a taking has occurred is that they are uncertain. Most decisions insist upon a case-by-case approach. In Pennsylvania Coal Co. v. Mahon, the court said that regulation which "goes too far" will constitute a taking. It did not define "too far." Nectow v. Cambridge invalidated an ordinance when the owner's loss in value was much greater than the loss of the zoning classification to the community. The Penn Central case considered the "character of the governmental action" and asked the question: Was there a deprivation of all reasonable return on the property? A reasonable return is not the same as a "near zero" return. In Agins the court found that a taking would occur when a zoning ordinance does not substantially advance legitimate state interests or denies the economically viable use of land. It acknowledged that no precise rule was available, that private and public interests had to be weighed. The New Jersey cases provide little additional help. In Morris Cty. Land v. Parsippany-Troy Hills Tp., the court held that regulation constituted a taking when the purpose and practical effect was to appropriate private property for open space. The court said this result followed when land could not be utilized for any reasonable purpose or when permitted uses are economically infeasible. A.M.G. v. Springfield spoke in terms of deprivation of all reasonable utilization. Harrington Glen v. Leonia referred to a deprivation of all practical use. Washington Market dealt in terms of effective destruction of beneficial use. Schnack required the deprivation of all reasonable use, a value reduction to near zero. American Dredging v. *56 State and Usdin v. D.E.P., using a doubtful test, distinguished legislation for public good and legislation to prevent public harm, requiring compensation for the former. While diminution in value is of importance in taking cases, it need not be expressed in terms of money. "There is no set formula to determine where regulation ends and taking begins although a comparison of values before and after is relevant ... it is by no means conclusive, see Hadacheck v. Sebastian [239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915)] where a diminution in value from $800,000 to $60,000 was upheld." Goldblatt v. Hampstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1961). In Pennsylvania Coal the court said that the degree of diminution in value was only "one fact for consideration." An analysis of the cases may be found in Johnson, "Compensation for Invalid Land Use Regulations", 15 Ga.L.Rev. 559 (1981).
With the possible exception of the "near zero" definition of Schnack, the Evesham regulations meet these tests. They go too far, destroy beneficial use, deny any reasonable return on the property and fail to advance a legitimate municipal interest. When the public good is balanced against the private harm, the harm far outweighs the good. No doubt the public will benefit if the Sheerr property is kept in its natural state since its trees will provide an appealing vista. No other public benefit is shown to exist. The public cannot use the property: it is privately owned. On the other hand, the property has been greatly depreciated in value and denied the opportunity for any realistic use. The regulations do not represent a valid exercise of the police power; they are not "reasonable in degree and ... necessary to the physically harmonious growth of land use in the municipality, [serving] the overall public interest of the community." Harrington Glen, supra 52 N.J. at 32. They fall clearly within the rule of Morris Cty. Land, which held that restricting the use of land to open space was a taking.

VIII. The Civil Rights Act; Damages Without a Taking

Plaintiff relies not only upon the taking clauses of the Federal and State Constitutions, but also upon their Due Process *57 and Equal Protection Clauses. She argues that she is entitled to damages for the deprivation of these constitutional rights under the Civil Rights Act, 42 U.S.C.A. § 1983, whether or not a taking has occurred.
The Due Process and Equal Protection Clauses of the Fourteenth Amendment of the Federal Constitution simply say: "nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Art. I, par. 1, of our Constitution confers these same rights. Our interpretation of the State Constitution's language may be more demanding than federal requirements. Burlington Cty. N.A.A.C.P. v. Mount Laurel, 67 N.J. 151, 174-175 (1975). These constitutional provisions differ from the Fifth Amendment; they make no reference to "just compensation." A discussion of this difference may be found in Haley, "Balancing Private Loss Against Public Gain to Test for a Violation of Due Process or a Taking without Just Compensation," 54 Wash.L.Rev. 275 (1979).
Plaintiff's alternative theory finds support in the cases. In Monell v. New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court, reversing prior law, held that municipalities were liable for constitutional violations in suits brought under the Civil Rights Act. Justice Rehnquist, dissenting, noted (at 721, 98 S.Ct. at 2051) that the majority had apparently permitted taking cases to be brought under the Civil Rights Act. In Owen v. Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the court further increased municipal liability; it held that municipalities were not entitled to any immunity defenses in civil rights actions. Suits for zoning violations of the Fifth and Fourteenth Amendments' Due Process and Equal Protection Clauses are maintainable under § 1983. Lake Country Estates v. Tahoe, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979); Hernandez v. Lafayette, 643 F.2d 1188 (5 Cir.1981); 6th Camden v. Evesham, 420 F. Supp. 709 (D.N.J. 1976). Justice Brennan suggests a distinction between the Fifth and Fourteenth Amendments' Due Process Clauses in *58 his dissent in San Diego Gas & Electric Co. v. City of San Diego, 101 S.Ct. at 1306:
A different case may arise where a police power regulation is not enacted in furtherance of the public health, safety, morals or general welfare so that there may be no "public use." Although the government entity may not be forced to pay just compensation under the Fifth Amendment, the land owner may nevertheless have a damage cause of action under 42 U.S.C. § 1983 for a Fourteenth Amendment due process violation. [footnote]
The EP-1 ordinance has been shown to violate the Due Process and Equal Protection Clauses of the State and Federal Constitutions. It may therefore be invalidated. However, plaintiff seeks different relief, namely, damages under 42 U.S.C.A. § 1983. May she recover?
This question, in a zoning context, is very troublesome. If the answer is yes, every invalid zoning regulation which depreciates the value of a property, no matter how little, will invite a suit for damages. Zoning regulations always affect property values, sometimes favorably, sometimes not. A right to collect damages under the Civil Rights Act for an unreasonable and unfavorable regulation, regardless of the amount of loss, would have vast economic consequences for every governmental body exercising regulatory powers. Its stifling effect upon innovative land use planning is obvious.
The logic of plaintiff's position is clear. However, that logic is one-sided; it ignores public consequences which invite a logical analysis running in a different direction. Some balancing of public and private interests must take place when remedies for invalid zoning legislation are addressed; if private remedies impose too heavy a burden upon the public, everyone loses. Some restriction of remedies is necessary.
Damages are not the only remedy provided by the Civil Rights Act; injunctive relief and declaratory judgments are available. Carter v. Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); Shellburne v. New Castle Cty., 293 F. Supp. 237 (D.C.Del. 1968). Nevertheless, damages may be the proper remedy in a given case, subject to limiting criteria.
*59 Our courts, when defining a "taking" under the Fifth Amendment, faced the same problem. That amendment could have been construed to require the payment of damages whenever legislation caused any depreciation in the value of property, since, realistically, a 10% loss of value is as much a taking as a 99% loss. The constitutional language did not limit takings to those governmental actions which went "too far," denied beneficial use or eliminated economic utility. These limiting definitions were adopted since "Government could hardly go on, if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, supra 260 U.S. at 413, 43 S.Ct. at 159. Identical considerations apply when addressing civil rights claims in connection with due process and equal protection violations. Consequently, identical rules must apply.
In the present case Evesham's regulations accomplished a taking under the Fifth Amendment. They therefore satisfy damage criteria applicable to civil rights actions, entitling plaintiffs to relief on the basis of their alternative theory.
There are two distinguishing features of the civil rights action: § 1988 of the Civil Rights Act permits a successful party to collect counsel fees (no specific application for fees has been made in this action); further, the municipality is not liable for punitive damages in a suit under the act. Newport v. Fact Concerts, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

IX. Noncompliance With the Master Plan

Evesham Township adopted a master plan prior to the adoption of the EP-1 amendment to the zoning ordinance. The land use element of that plan designates the plaintiff's EP-1 lands as "park or preservation area." Nothing in the plan indicates that this area may be used for any commercial or residential purposes. Nevertheless, the EP-1 amendment to the zoning ordinance, through its scheme of conditional uses, authorizes commercial and residential construction. The legislation is *60 therefore contrary to the provisions of N.J.S.A. 40:55D-62, which requires such amendments to be "substantially consistent with the land use plan element of the master plan or designed to effectuate such plan element." That statute does permit a governing body to adopt an inconsistent amendment, "but only by affirmative vote of a majority of the full authorized membership of the governing body with the reasons for so acting recorded in its minutes." The township, in adopting the inconsistent EP-1 amendment, failed to record any reasons in its minutes. Furthermore, under N.J.S.A. 40:55D-64 the governing body was required to refer the proposed amendment to the planning board. This was not done. Under the circumstances, the amendment to the zoning ordinance did not become effective.
This does not permit the municipality to escape liability for damages. On the contrary, it emphasizes the arbitrary nature of the governing body's action in adopting the EP-1 ordinance. Plaintiff's lands were adversely affected by the ordinance until its invalidity was determined in this action. Its adverse effect upon plaintiff's lands until now is obvious.

X. CH-5  The Highway Commercial District

A portion of plaintiff's property is zoned CH-5, a designation which permits various commercial uses. Plaintiff claims that the designation is unreasonable and she seeks to set this part of the ordinance aside. The principal argument is that the restriction of commercial uses to five-acre lots is excessive; that most commercial users do not require more than one or two acres of land; that the five-acre requirement practically eliminates small proprietors as purchasers of any lands in the CH-5 district. They also claim that design criteria and tree removal provisions make commercial use unlikely. Defendants, however, believe that the five-acre requirement is reasonable. They point to the possibility of condominium ownership and leasing arrangements permitting the use of several shops on a single five-acre lot. Their experts describe this as good zoning practice.
*61 The CH-5 zone differs from the EP-1 zone in several important particulars:
(1) Enumerated uses are permitted, not conditional.
(2) The purposes of the ordinance are not limited to environmental protection.
(3) Set-back may be reduced from 100 feet to 50 feet.
(4) Removal of trees is prohibited only within the right-of-way line of Route 73.
(5) The area is not reserved for acquisition in the master plan or on the official map.
(6) EP-1 conditions relating to fill and aquifer protection are not imposed.
A municipal zoning ordinance is entitled to a presumption of validity. Ward v. Montgomery Tp., 28 N.J. 529 (1959). If the local legislative judgment "is at least debatable it is to be sustained." Bow and Arrow Manor v. West Orange, 63 N.J. 335, 343 (1973). Surely, the validity of Evesham's CH-5 classification is at least debatable. The contradictory testimony presented by the contending sides reflects differences of opinion; the governing body, in enacting the ordinance, was entitled to rely upon the opinions of its own planners. The attack upon the validity of this zoning arrangement must fail.

XI. Remedies

Plaintiffs first seek an order requiring defendant municipality to condemn their property, to take title and pay for its market value. This is not appropriate. "Generally speaking, condemnation should be ordered only where eventual acquisition appears inevitable ... or where equitable considerations mandate that remedy." Washington Market Enterprises v. Trenton, 68 N.J. 107, 123 (1975). Justice Brennan, in his dissent in San Diego Gas & Electric Co., supra, suggested that condemnation was never to be ordered. He pointed out that
... nothing in the Just Compensation Clause empowers a court to order a government entity to condemn the property and pay its full market value where the "taking" already effected is temporary and reversable and the government wants to halt the "taking." Just as the government may cancel condemnation proceedings before the passage of title... or abandon property it has temporarily occupied or invaded ... it must have the same power to rescind a regulatory "taking."
*62 While Justice Brennan's statement does not represent binding precedent, the reasoning is entirely persuasive. Further, the equities referred to in Washington Market are not present.
Temporary takings are compensable. In Lomarch v. Englewood, 51 N.J. 108 (1968), the court considered the constitutional validity of part of the Official Map Act, N.J.S.A. 40:55-1.32, 1.38, which permitted a municipality to reserve land for one year for park and other public purposes. It construed the act as requiring payment of compensation while the reservation was in force, since otherwise the legislation would effect an unconstitutional taking. In Washington Market, supra, the value of plaintiff's property was depreciated very significantly by a declaration of blight, later rescinded. The court required the payment of damages, measured in part by the time during which the declaration was in force. In 6th Camden Corp. v. Evesham Tp., 420 F. Supp. 709, 728-729 (D.N.J. 1976), the court recognized the right to damages for a harsh, nonacquisitory regulation. See, also, Cordeco Development Corp. v. Vasquez, 539 F.2d 256, 261 (1 Cir.1976); Jones v. Dept. of Transportation, 22 Cal.3d 144, 148 Cal. Rptr. 640, 583 P.2d 165 (Sup.Ct. 1978); Prince George's Cty. v. Blumberg, 44 Md. App. 79, 407 A.2d 1151 (Sp.App. 1979); City of Austin v. Teague, 570 S.W.2d 389 (Tex. Sup.Ct. 1978); San Antonio River Auth. v. Garrett Bros., 528 S.W.2d 266 (Tex.Civ.App. 1975). In his San Diego dissent, Justice Brennan said:
The fact that a regulatory "taking" may be temporary, by virtue of the government's power to rescind or amend the regulation, does not make it any less of a constitutional taking. Nothing in the Just Compensation Clause suggests that the "taking" must be permanent and irrevocable. Nor does the temporary reversable quantity of a regulatory "taking" render compensation for the time of the "taking" any less obligatory. [101 S.Ct. at 1306]
Many approaches to the calculation of damages for a temporary taking have been discussed by writers on the subject. See Hagman Misczynski, Windfalls for Wipeouts, 300 (1978). Several formulas are suggested in the cases:
(a) In Washington Market the court required the plaintiff to

*63 ... establish what the property would have been worth [at the time of the taking] had there been no declaration of blight and had the ensuing and related activities of the defendant not occurred. Finally, the value of the property as of the date the project was abandoned must be ascertained. This value should actually be determined as of a date somewhat subsequent to the date abandonment was announced so that the market's response to the lifting of the threat of condemnation can be better evaluated. Plaintiff will be entitled to the difference between these sums, with interest from the date of abandonment. [68 N.J. at 123-124]
(b) In Lomarch the court held that compensation was to equal "the value of an `option' to purchase the land for the year," with the "sum [to] be established by expert advice and opinion."
(c) In Usdin the trial court held that if damages had been awarded, it would have made them equal to an annual rent of 10% of the value of the property without the restrictive regulation minus the residual value of the property while the regulation was in force, said to be a value which would be paid by a "land speculator." (This was dictum, not affirmed by the Appellate Division.)
(d) The San Diego dissent stated:
In my view, once a court establishes that there was a regulatory "taking", the Constitution demands that the government entity carry just compensation for the period commencing on the date the regulation first effected the "taking" and ending on the date the government entity chooses to rescind or otherwise amend the regulation. [101 S.Ct. at 1304]
........
Ordinary principles determining the proper measure of just compensation, regularly applied in cases of permanent and temporary "takings" involving formal condemnation proceedings, occupations, and physical invasions, should provide guidance to the courts in the award of compensation for a regulatory "taking". [Id. at 1307]
(Note that Justice Brennan would permit the temporary taking to continue until the government entity chooses to rescind it. He says: "The government must inform the court of its intentions vis-a-vis the regulation with sufficient clarity to guarantee a correct assessment of the just compensation award". [Id. at 1307]).
The EP-1 ordinance, since it was inconsistent with the master plan and not referred to the planning board, was not properly *64 adopted. It will become a nullity when the judgment in this matter becomes final. Consequently, the PPR zoning has been, and continues to be, the only effective zoning of plaintiff's property. In any case, there has been a taking, continuously from the date of the enactment of the PPR ordinance until the present time, under either the PPR or the EP-1 designation, and that taking will continue until the municipality changes its ordinance, if it intends to do so. By way of compensation, it is appropriate that the municipality pay plaintiff the option value of the premises from the date of the enactment of the PPR ordinance to the date on which the municipality chooses to remove that designation. Lomarch supports this approach. Option value must be established by expert testimony and calculated on the market value of the property without any zoning regulation. Legal fees, the cost of expert witnesses and other expenses incurred in establishing the "option," as well as real estate taxes, shall be added to the value otherwise fixed. Interest is to be paid at the rate of 12% as follows: (1) on monies actually expended by plaintiffs, from the date of the expenditure; (2) on the amount or amounts fixed for the value of the option, from the dates those amounts should have been paid, proceeding on the assumption that payment was required annually, in advance.
Some authorities argue that damages should be based upon the assumption that certain maximum zoning would always be permitted by a court requiring market value to be calculated on the basis of that zoning. This approach, however, requires a court to speculate. Zoning regulations are as varied as the imagination of local authorities can make them. What a court would decide may not be what a municipality would find acceptable; few zoning regulations are straightforward; most are affected by conditions and exceptions. Since the municipality has imposed the unconstitutional regulation upon plaintiffs, there is no reason for the court to guess at what its intentions might have been under other circumstances or to permit it to advance, for damage purposes, a probably debatable zoning *65 regulation which, by hindsight, improves its position. The selected damage approach makes the plaintiff whole, producing an equitable result.
In addressing the damage question, consideration has been given to the question of whether plaintiff, in fact, suffered damages. She held the land for investment purposes, speculating on its increase in value. She may or may not have been able to sell the property, absent improper zoning. It is apparent that she cannot claim lost profits; such profits would be too uncertain to permit proof. See 6th Camden, supra. The only loss that plaintiff can show is the loss of all selling prospects because of the restrictive zoning. That circumstance, however, should entitle plaintiff to recover reasonable damages; it is apparent that lost opportunity has value, however difficult it is to measure. The recovery of option value, based upon the market value of the land without zoning, fairly recognizes that loss and encourages the township to act appropriately by adopting permissible zoning or purchasing the land.
Also considered was the question of whether opportunities to sell were, in fact, present. No taking with any adverse effect could occur until plaintiff was ready, willing and able to sell. An agreement of sale covering all of plaintiffs' property had been executed before the PPR ordinance was adopted. That adoption frustrated the sale. The broker who had handled the purchase, management and sale of the property, testified to its constant exposure to the market, to continuing inquiries and possibilities, all of which, in his opinion, bore no fruit because of the legislation. The burden of proving plaintiff's readiness and ability to sell on the date the initial PPR ordinance became effective and the readiness to sell thereafter, was therefore carried.
It is also fair, in connection with claims of regulatory takings, that the municipality have notice of the claim. See Hernandez v. Lafayette, supra. Notice provides an opportunity to correct improper legislation. In the present case defendants were *66 warned repeatedly and in advance that the legislation was unconstitutional. It is apparent that the notice requirement was satisfied.
The amount of damages will be established after a further hearing on that issue is held.
NOTES
[1] A questionable theory. See below.
[2] And thereafter. See below.