160 N.J. Super. 343 (1978)
389 A.2d 1006
HELEN SCHNACK, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF CORA HILDEBRANT AND EDWARD SCHNACK, HER HUSBAND, PLAINTIFFS-RESPONDENTS,
v.
STATE OF NEW JERSEY, BY THE DEPARTMENT OF TRANSPORTATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 1978.
Decided June 19, 1978.
*344 Before Judges LYNCH, BISCHOFF and KOLE.
Mr. Jerry Fischer, Deputy Attorney General, argued the cause for appellant (Mr. John J. Degnan, Attorney General, attorney; Ms. Erminie L. Conley, Deputy Attorney General, of counsel).
Mr. Edward D. McKirdy argued the cause for respondents (Messrs. McKirdy and Risken, attorneys).
PER CURIAM.
This appeal involves a consideration of whether the actions of the State Department of Transportation *345 (DOT) in filing an alignment preservation map for a new highway which would run through plaintiffs' property and that of others, and in acquiring and demolishing nearly all the residences in the vicinity, amount to a "taking" of plaintiffs' property for which the Constitution requires just compensation.
The property which is the subject of this controversy is a 2.5-acre tract in Morris Plains, New Jersey. Triangular in shape, it is bordered on the west by Route 53 and on the east by Tabor Road. In the northern section of the tract is a two-story frame house built in 1802 wherein plaintiffs, Helen and Edward Schnack, reside. The property also contains a two-story frame barn, a small cottage and a one-car garage. Access to these structures is had from Tabor Road on the west. The tract is zoned R-2 residential.
In the mid-1960's there appeared several newspaper articles which forecast that a new highway, Route 178, would be built in order to connect Routes 10 and 24 in Morris County. The DOT held a public hearing on the proposed project in 1968 and it was there that Helen Schnack learned that her property[1] was in the path of the new highway. in March 1970 an "alignment preservation map" was filed pursuant to N.J.S.A. 27:7-66, showing the path of the proposed highway and the properties it would cross.[2] Thereafter plaintiff received a letter from the DOT on May 28, 1970 indicating that the proposed public highway improvement required the purchase of her property and explaining that State appraisers would contact her.
*346 On June 1, 1970 a representative from the DOT contacted plaintiff to insure that she received the May 28 letter and to further explain condemnation procedures. He also told plaintiff and her mother that if there were tenants on the property, "to make sure that we have them on a month-to-month basis so we could notify them if they have to move." The DOT subsequently sent several appraisers to the property to make evaluations.
On January 19, 1972 a right-of-way negotiator called upon plaintiff at her home and tendered a written offer of $84,500 for her property. Plaintiff did not accept the offer at that time and indicated that she wished to consult with her own appraiser and attorney. She also wished to speak with the builder she had hired to construct a new home on property which had been purchased earlier by her mother. When the builder informed her that construction could not start until the spring, she called the right-of-way negotiator, who informed her that if she accepted the offer, she would have to move within 90 days. Plaintiff was willing to accept the offer of the State at that time, but was compelled to demur because of her own difficulty in locating alternative housing. She feared that the 90-day limitation gave her too little time to move. Plaintiff had been given one month to accept the State's offer, and the right-of-way negotiator called several times each week to see if plaintiff had made up her mind. Ultimately, the offer lapsed and the DOT subsequently stopped further acquisitions.
Apparently, neither the DOT nor plaintiffs thereafter took any action regarding the subject property until April 13, 1973, when plaintiff's mother died. At the suggestion of her attorney, plaintiff wrote to the DOT concerning the status of the subject premises and the DOT replied that it had "placed further acquisitions on this project in `suspense.'" Plaintiff thereupon undertook a series of attempts to sell her property but met with no success. Apparently the potential purchasers were not dissuaded so much by plaintiff's $200,000 asking price as they were by the fact that the *347 DOT had filed its alignment map showing that the property was subject to eventual condemnation.
At present plaintiffs assert that they "have no neighbors" by reason of the State's acquisition and demolition of surrounding properties. Originally, there were seven residences in plaintiffs' immediate vicinity. There now remains only a gas station, a tavern, a warehouse and a local bank branch office. Plaintiffs presently lease the garage on their property at $40 a month and some land for billboards at $500 a year (on a month-to-month basis).
Plaintiffs' expert, P. David Zimmerman, a planning consultant, testified that the "planning and imminence of Route 178 has substantially impaired the usability of the property for any purpose." He noted also that because of the destruction of surrounding homes and because all recent development in the general area has been nonresidential, the best use of the property would be commercial, business or multi-family. He added that these factors, along with the traffic patterns in the area, indicate that there would be a reasonable probability for a zoning change in the future. He iterated that a residential use of the property at present would be inappropriate.
Thomas P. Welsh, a licensed real estate appraiser, also testified as an expert for plaintiff. He opined that the property would have a value of approximately $100,000 were it not for the State's alignment map, and that given the map's existence, the property had a "distress value" of $40,000. As he explained:
The property, in my opinion, would probably be unsalable if it were not for the fact that there's a severe housing shortage in Morris County. It would almost be unsalable. It would almost be unrentable if it weren't for the fact that we have a critical housing shortage. That's the only thing that forces me to come up with some kind of a value or some kind of a use that I would call a distressed use or distressed value.
Welsh added that he used January 19, 1972 as the crucial date for valuation.
*348 The trial judge found on the basis of the facts outlined above that there had been an "inverse condemnation" of plaintiff's property by the State, requiring payment of compensation. In reaching this conclusion, he relied upon the holding in Washington Market Enterprises v. Trenton, 68 N.J. 107 (1975). In that case the owner of a commercial building claimed that a declaration of blight in a downtown area of the City of Trenton wherein his building was located precluded him from attracting tenants and thereby destroyed the value of his building. It appeared that in the wake of the declaration the area surrounding the building deteriorated and the owner was unable to even meet the cost of upkeep. The building was eventually sold to meet taxes. The Supreme Court held that such circumstances may warrant the payment of compensation and announced:
We hold that where the threat of condemnation has had such a substantial effect as to destroy the beneficial use that a landowner has made of his property, then there has been a taking of property within the meaning of the Constitution. [at 122]
It would seem that the trial judge herein equated the destruction of the beneficial use of a piece of property with a substantial impairment in the "salability" of that property. However, that equation is not warranted by the holding in Washington Market. An impairment in the ability of a landowner to sell his property obviously arises whenever the State threatens to condemn that property. The rule announced in Washington Market does not require payment of compensation simply because such difficulty arises. There, as noted, the landowner was effectively prevented from deriving any benefit from his building. Hence, our inquiry must be whether the threat of condemnation has destroyed the landowner's ability to derive a reasonable benefit from his property.
An interpretation of Washington Market which would require the threat of condemnation to destroy any beneficial *349 use of the subject property before payment of compensation is required, as opposed to an impairment in the "salability" of such property, may be supported by analogy to the decisional law on the issue of condemnation by regulation. In such cases it is generally held that governmental regulation which effectively deprives an owner of all reasonable uses of his property amounts to a compensable taking. Morris County Land, etc. v. Parsippany-Troy Hills Tp., 40 N.J. 539, 557 (1963); Toms River Affiliates v. Environmental Protec. Dept., 140 N.J. Super. 135, 148 (App. Div.), certif. den. 71 N.J. 345 (1976); see Payne, "A Survey of New Jersey Eminent Domain Law," 30 Rutg. L. Rev. 1111, 1194 (1977). By contrast, regulations which leave the owner free to reasonably use his property, albeit under the restrictions imposed by the regulations, and also with some diminution in market value, are not regarded as compensable. So, too, here. Where the threat of condemnation does not preclude the owner from deriving a beneficial use from his property, compensation is not required.
Further, it is well established that a mere plan by the State to acquire property does not amount to a compensable taking. Thus, in Kingston East Realty Co. v. State, 133 N.J. Super. 234 (App. Div. 1975), a case analogous to that at bar, plaintiff owned a tract of land in the path of a proposed highway. He contended that the action of the State in filing an alignment map and acquiring nearby parcels of land, inhibited his own plans for development, thereby giving rise to a compensable taking. The Appellate Division disagreed and in an opinion by Judge (now Justice) Handler declared:
The mere plotting and planning in anticipation of condemnation without any actual physical appropriation or interference does not constitute a taking or compel the State to institute condemnation proceedings. [Citations omitted]
It is asserted that the Department has denied plaintiff "the right to use and enjoy" its property and that the Department has not rescinded its alignment map or revised its plans to indicate any *350 change of its intention to build Route 92 over plaintiff's property. Aside from the issue of whether there was a temporary taking by the State of an interest in property in the nature of an option under N.J.S.A. 27:7-67, the actions complained of by plaintiff did not deprive it of the use of its property. The planning engaged in by the State involving plaintiff's property, the filing of an alignment map, the acquisition of a nearby parcel, and the refusal to abandon any long-range plan for the eventual acquisition of the property for the proposed highway did not, in actuality, bar plaintiff from utilizing and developing its property. Hence, a constructive or de facto taking did not occur. Cf. Jersey City Redev. Agency v. Bancroft Realty Co., 117 N.J. Super. 418, 424 (App. Div. 1971); East Rutherford Industrial Park, Inc. v. State, 119 N.J. Super. 352, 370 (Law Div. 1972). [at 239-240]
The court also noted that there was no actual or threatened interference with plaintiff's property. Id. at 240. Accord: Far-Gold Constr. Co. v. Chatham, 141 N.J. Super. 164, 169 (App. Div. 1976); East Rutherford Industrial Park v. State, 119 N.J. Super. 352, 361 (Law Div. 1972).
Thus, while these decisions expressly approve the principle that a mere proposed taking of property does not warrant compensation  a principle not inconsistent with Washington Market  it is just such a proposal which causes prospective buyers to shy away from purchasing that property. In light of this, we can only conclude that such a practical restriction on the "salability" of property is not a determinative factor in applying the Washington Market formula. Therefore, plaintiffs' reliance upon this factor to bring them within the rule of Washington Market is misplaced.
In any event, the holding in Washington Market clearly contemplates a reduction in value of a piece of property to "near zero" as a result of the actions of the condemning authority before a landowner is entitled to compensation. Payne, supra at 1218. See N.J. Sports Exp. Auth. v. Giant Realty Assocs., 143 N.J. Super. 338, 351 (Law Div. 1976). Such interpretation is supported by the court's recognition that
*351 Our holding appears narrow if compared with the California Supreme Court decision in Klopping v. City of Whittier, 8 Cal.3d 39, 104 Cal. Rptr. 1, 500 P.2d 1345 (1972). That case held that a measurable decrease in market value due to an unreasonable delay on the part of the condemning authority is compensable. While not mentioned in Klopping, California's constitution provides that property shall not be "taken or damaged" without just compensation, Cal. Const., art. I, § 14. More than twenty state constitutions contain this "damaging" provision, Note, 26 Stan. L. Rev. 1439, 1439-40 (1974). See generally 3 Nichols, Eminent Domain § 6.44 et seq. (3 ed. Sackman 1974). [68 N.J. at 122, n. 9]
Further support for the proposition that a virtual destruction of the beneficial use of property is a necessary prerequisite to compensation may be found in Morristown Bd. of Ed. v. Palmer, 88 N.J. Super. 378 (App. Div. 1965), rev'd as premature, 46 N.J. 522 (1966), which the court in Washington Market expressly approved. 68 N.J. at 123. There, the New Jersey Highway Department undertook the construction of a major highway which ran within 40 feet of a wing of plaintiff's elementary school. Access ramps to and from the highway completely surrounded the school, exposing the pupils to physical danger, noise, fumes and interference with their education. The Deputy Commissioner of the State Department of Education also advised that the proposed construction would eventually necessitate abandonment of the school. Judge Goldmann, writing for the majority, reversed the trial judge's dismissal of the complaint for damages in condemnation:
The damage to plaintiff's school property, to the point of total or substantial destruction of its beneficial use as a school facility would (assuming plaintiff can prove the allegations made in the complaint and supporting affidavits) be different in kind from the damage suffered by other property owners in the area. Cf. Richards v. Washington Terminal Co., 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088 (1914). If plaintiff is correct in its assertions, it will be faced with the dilemma of remaining where it is and carrying on as best it can, at the risk of children's lives and the certainty of substandard education, or moving the entire school operation to another location. If the beneficial use has indeed been destroyed, there will be no other choice but to move, at an alleged cost of some 2-2 1/2 million *352 dollars. In such a case justice demands that the right to compensation as well as the amount thereof be determined by the effect of the proposed highway construction upon the school facilities, without regard to whether such construction involves a physical invasion of the property. [88 N.J. Super. at 390-391]
See also, E. Rutherford Industrial Park v. State, supra 119 N.J. Super. at 369, where Judge (now Justice) Pashman alludes to the distinction between a mere reduction in value and a denial of the beneficial use of a piece of property.
Those jurisdictions, such as California, which will compensate a mere depreciation in market value, generally are governed by state constitutions which, as noted earlier, compel an award for either a "taking or damage," as opposed to the New Jersey Constitution which requires compensation only for a "taking." 2A Nichols, Eminent Domain (Sackman ed. 1970), § 6.44 at 6-151. In any event, cases such as Lincoln Loan Co. v. State, State Highway Com'n, 274 Or. 49, 545 P.2d 105 (Sup. Ct. 1976), cited by respondents, which indicate that a cloud of condemnation may result in compensation upon a diminution in market value, even where that diminution is as small as $5,000, are entirely outside the holding in Washington Market, irrespective of the nature of the governing state constitution. The citation of the Oregon case of Thornburg v. Port of Portland, 233 Or. 178, 376 P.2d 100 (Sup. Ct. 1963), in Washington Market can hardly compel the New Jersey judiciary to follow such extension of Oregon case law on the subject, especially since our own case law so clearly requires a contrary result.
In Washington Market it will be noted that the area had deteriorated following the declaration of blight, thus, presumably, making plaintiff's property less attractive to prospective tenants. Indeed, plaintiff was ultimately compelled to sell his building in payment of taxes. The declaration of blight entirely destroyed the building's preexisting commercial value. Further, it is not difficult to imagine that the State's eventual abandonment of its project would not immediately (or even foreseeably) give rise to a renewed marketability *353 of tracts in the area, since the neighborhood, which provided the prime attraction for commercial tenants and developers, no longer existed. Thus, the actions of the State resulted in a permanent depression of the area, for all practical purposes.
As noted earlier, the factual circumstances in the case at bar are far different from those before the court in Washington Market. Here there is no depression of the area effectively destroying the beneficial use of plaintiffs' property. Indeed, plaintiffs' own expert noted that the destruction of surrounding properties was one factor which enhanced the likelihood of a zoning change, permitting commercial development and thereby raising the value of plaintiffs' property. Also, plaintiffs themselves have continued to enjoy the use of their property as a residence and have even generated rentals in excess of those received prior to the State's actions. Hence, the value or beneficial use of plaintiffs' property has not been destroyed.
Further, even assuming that the difficulty in selling the property is a relevant consideration, the record shows that prospective buyers lost interest in the property solely because of the highway proposal and not because of the surrounding "devastation" which, as noted earlier, was a primary factor in the decision in Washington Market. In fact, the record, fairly read, would indicate that since the proposed highway project has been abandoned, the commercial value of plaintiff's property will blossom, unlike that in Washington Market. One can reasonably estimate that, on the basis of prices considered by plaintiffs' prospective commercial buyers, the value of the property may be many times greater than the $84,500 originally offered by the State. Thus, there are factors in this appeal which significantly distinguish it from Washington Market. There would be no small inequity if the damage award is upheld and then, in the wake of the abandonment of the highway project, plaintiffs derive a benefit much greater than the original value of the property.
*354 Plaintiffs have, at best, shown a diminution in value of their property during the pendency of the proposed  but now abandoned  project. They have not demonstrated that there has been a substantial destruction of the beneficial use thereof. Therefore inverse condemnation is not justified and the judgment of the trial court is, in all respects, reversed.
NOTES
[1] At this time the property was owned by Helen's mother, Cora. For convenience of expression, we shall refer to the property as if it were Helen Schnack's, since the DOT dealt primarily with her throughout the period in question.
[2] By letter of December 13, 1977, addressed to the Hanover Township Clerk, the DOT withdrew the previously filed alignment preservation maps for the proposed road (Route 178).