667 A.2d 362

TOWNSHIP OF WEST WINDSOR IN THE COUNTY OF MERCER, A
MUNICIPAL CORPORATION OF THE STATE OF NEW JER-
SEY, PLAINTIFF–APPELLANT, v. YVETTE NIERENBERG
AND PRINCETON MANOR ASSOCIATES, DEFENDANTS–RE-
SPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 8, 1995—Decided November 22, 1995.

438

Before Judges BAIME, VILLANUEVA and KIMMELMAN.

*Richard L. Rudin* argued the cause for appellant (*Weiner, Lesniak*, attorneys; *Mr. Rudin*, of counsel; *Mr. Rudin* and *Susan Sigle*, on the brief).

*Edward D. McKirdy* argued the cause for respondent Yvette Nierenberg (*McKirdy & Riskin*, attorneys; *Mr. McKirdy*, on the brief).

*Andrew J. Rothman* argued the cause for respondent Princeton Manor Associates (*Greenbaum, Rowe Smith, Ravin & Davis*, attorneys; *Mr. Rothman*, on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

The narrow question presented in this case concerns the date for valuing property condemned by the Township of West Windsor. The Eminent Domain Act of 1971 (*N.J.S.A.* 20:3–1 to –50) provides three alternative dates for valuation—the date the condemnor takes possession of the property, the date the condemnation suit is commenced, or the date on which action is taken by the condemnor which substantially affects the condemnee's use and enjoyment of the property. *N.J.S.A.* 20:3–30. The value of the property on the date of the earliest of these events is to control for the purpose of determining just compensation. *Ibid.*

At issue is whether the Township's letter to the defendants advising them that it might acquire their vacant tract for development of a community park so impaired the marketability of the property as to require that the value of the parcel on that date be used to determine fair compensation. Following an evidentiary hearing, the Law Division concluded that the letter triggered a

downward fluctuation of the value of the property directly attributable to the proposed condemnation, thus establishing the date of valuation.[1]  We disagree.  We hold that the Township's equivocal expression of its interest in acquiring the land did not so directly interfere with defendants' use and enjoyment of their property as to fix the date of valuation for determining just compensation.

## I.

Princeton Manor Associates is a partnership formed in 1987 by Philip Kramer, Stuart Nierenberg, Sol Kramer, Ely Kramer and Marilyn Nierenberg for the purpose of developing a fifty-acre tract initially owned by Stuart's mother, Yvette.  The property fronts on the Princeton–Heightstown Road and partially consists of wetlands.  Approximately 44.6 acres are suitable for development.

The property is zoned R–2 residential, which permits single-family detached dwellings on three-quarter acre lots with seventy-five feet of frontage.  Open space cluster developments, with minimum lot size of 20,000 square feet, are permitted as a conditional use if the property is serviced by either public water or sewer.  The property here is serviced by public water and partially by public sewer.  It is undisputed that the highest and best use of this property is for residential development of single-family dwellings.

Although the exact chronology is not entirely clear, prior to 1987, the property, along with two contiguous parcels, was desig-

---

[1] The Law Division subsequently ordered the appointment of commissioners. The judgment appointing commissioners, because it disposes of all issues other than value, is considered a final judgment which may be appealed of right.  *See* *State v. New Jersey Zinc Co.,* 40 *N.J.* 560, 572, 193 *A.2d* 244 (1963); *State v. Hess Realty Corp.,* 226 *N.J.Super.* 256, 261, 543 *A.2d* 1050 (App.Div.), *certif. denied,* 113 *N.J.* 383, 550 *A.2d* 484 (1988), *and aff'd,* 115 *N.J.* 229, 557 *A.2d* 1372 (1989), *and cert. denied sub nom. Greg's Hess Station, Inc. v. New Jersey Comm'r of Transp.,* 493 *U.S.* 964, 110 *S.Ct.* 406, 107 *L.Ed.2d* 371 (1989); *Tennessee Gas Transmission Co. v. Hirschfield,* 38 *N.J.Super.* 132, 136, 118 *A.2d* 64 (App.Div. 1955).

nated by the Township's master plan as a potential site for a community park. Phillip Kramer, a highly experienced real estate developer, was aware of this fact both when the partnership was formed and when it purchased the property from Yvette on July 8, 1987 for $4,500,000.

Prior to January 1988, the Township Committee adopted a resolution authorizing appraisals of the proposed park site and a request for a Green Acres loan. In early 1988, the Township was awarded a $3 million low interest loan, and the Township Committee authorized the mayor to enter into an agreement with the Green Acres Program to fund acquisition of the properties for park development.

On May 13, 1988, Princeton Manor filed an application for a major subdivision of its fifty-acre property into forty-eight half-acre lots, a cluster development. On June 3, 1988, the partnership was advised that its application was not complete because the entire property was not within the sewer service area, and, therefore, percolation tests and soil log data would be required to determine the property's suitability for septic systems. At that point, Princeton Manor had two choices. It could attempt to have the sewer service plan amended to encompass the entire tract so the project could proceed with public sewers, or it could conduct the percolation tests at a cost of $40,000 to determine whether the land was suitable for septic systems.

The partnership was in the process of considering these options and had begun studying the sewer plan amendment process when it received a letter from the Township Administrator dated July 29, 1988. That letter, addressed to Yvette, is the focal point of the partnership's contention regarding the date of valuation, and we, thus, reproduce it in its entirety:

Dear Ms. Nicrenberg:

### TOWNSHIP MASTER PLAN/COMMUNITY PARK

Enclosed is a copy of the facilities portion of the Township Master Plan. Three (3) properties to comprise a potential Community Park had been designated in it.

In conjunction with the Master Plan, the Township applied to the New Jersey Green Acres for a low-interest loan for the properties' purchase. Several months ago, the Governor notified us of our award of a $3 million loan to supplement the Township's funding for purchasing this property. On June 27, 1988, the Township Committee authorized the Mayor to enter into an agreement with New Jersey Green Acres to fund this acquisition.

Therefore, this is formal notification that West Windsor Township may acquire this property for the purpose of establishing a—Community Park.

Shortly, the Township along with independent appraisers and the Green Acres Office will determine a fair-market value for the property.

In the interim, I am available to answer your questions regarding the above items.

Yvette Nierenberg received letters in August and September 1988 from two appraisers retained by the Township inviting her to accompany them during their inspection of the property. Pursuant to the appraisers' request, the partnership's attorney, Peter Buchsbaum, forwarded information relating to the terms of the 1987 contract. According to Michael Hartsough, the Township's attorney during this period, the appraisals were required for Green Acres funding. The state program had to approve the appraised value of the property before it would lend the Township the money necessary to acquire it.

The matter remained dormant for several months during which the Township's Green Acres application was pending. This silence was broken by an exchange of heated letters between Buchsbaum and Robert Bruschi, the Township Administrator. Buchsbaum complained that the partnership could not proceed with its plans for developing the property while the Township was considering acquiring it for use as a park. Bruschi responded that the Township was in no position to begin negotiations concerning the purchase of the property until it received approval of the contemplated acquisition from the Green Acres Program.

In March 1989, Hartsough was advised that Green Acres had approved the acquisition. The Township Committee then adopted a resolution authorizing Hartsough to send "offer to purchase" letters to Princeton Manor and to Cox–Sheffey, the owner of the adjacent tract. In a letter from Hartsough dated April 19, 1989, Buchsbaum was informed that the Green Acres Program had

accepted an appraisal valuing Princeton Manor's property at approximately $3,000,000. Although the letter provided that Princeton Manor had fourteen days in which to accept the offer, Hartsough agreed to several extensions, during which negotiations continued.

The Township had budgeted $7,000,000 for the acquisition and development of the park. Once the appraisals were obtained on the Princeton Manor and Cox–Sheffey tracts, it became apparent that acquisition of the entire properties would leave the Township with no money for development of the park. Consequently, the Township began to consider the feasibility of acquiring only a portion of the Princeton Manor property. The negotiations between Buchsbaum and Hartsough reflected this shift in focus. Princeton Manor proposed that it be permitted to construct 115 townhouses on thirteen acres and that the Township acquire the remaining land. The Township rejected that proposal but suggested that it was amenable to the construction of forty-eight units on the property to be retained by the partnership. Various counterproposals were then offered by the parties.

Negotiations continued through 1989 and into 1990. Princeton Manor offered to convey thirty-seven acres to the Township for $1,250,000 provided the remaining land could be developed with not more than sixty units. The Township Committee adopted a resolution accepting that offer, conditioned on the rezoning of the property and planning board approval. However, the Township park planning committee recommended against the proposed rezoning, noting that each dwelling unit would be situated on only one-fifth of an acre, a far too intensive use of the land to be retained by Princeton Manor. The proposed zoning change was ultimately defeated.

The focus of the negotiations then returned to the Township's original proposal for acquisition of the entire tract. However, negotiations broke down after the defeat of a bond ordinance that would have permitted the Township to incur sufficient debt to fund the purchase. On January 22, 1991, Princeton Manor filed a

complaint in the Law Division seeking, among other things, just compensation for the temporary and permanent taking, or in the alternative, a rezoning of its property to permit construction of sixty units on thirteen acres and payment of $1,250,000 for the remaining thirty-seven acres.

On May 29, 1992, the parties entered into a contract under which the Township purchased thirteen acres for $700,000. The contract contained a reference to the fact that the Township's planner and engineer had conducted a preliminary review of a concept plan for the development of Princeton Manor's remaining thirty-seven acres, showing thirty-four building lots. The reference also noted that "both [officials] ha[d] indicated no objection to the lots and layout as proposed in the concept plan provided that all ordinance standards [were] met at the time of an actual application for development." Paragraph twenty-nine of the contract, however, indicated that the contract constituted a stipulation of dismissal of Princeton Manor's suit against the Township, and paragraph thirty provided that "[e]xecution of this contract shall not bind the Township and the West Windsor Planning Board to any development application by the Seller in the future."

Although the May 29 contract effectively terminated Princeton Manor's suit against the Township, the saga of their bitter dispute continued. The Township remained interested in purchasing the remaining thirty-seven acres. Despite protracted negotiations, the parties were unable to reach an agreement concerning this purchase. After Princeton Manor's rejection of the Township's offer to acquire the remaining land for $1,210,000, the Township, on May 3, 1993, filed its complaint for condemnation.

The sole issue presented at trial was the date on which the property was to be valued. Steven Segal offered his opinion for Princeton Manor. He asserted that the July 29, 1988 letter "cast a pall" over the property and "ha[d] a chilling effect," because no developer would find the land attractive once it learned of the Township's interest in acquiring it for use as a community park.

The witness testified that potential developers in 1988 would have looked for unencumbered properties because at that time real estate development was at its peak. Noting that planning board applications are expensive and time consuming endeavors, Segal concluded that no developer would have been willing to go through the process facing the possibility that its development plans would be thwarted upon the Township's acquisition of the property. While conceding that he had no specific data upon which the loss of value caused by the letter could be quantified, the witness estimated that the letter reduced the property's market value by twenty-five percent.

The Township presented Russell Sterling as its expert. Sterling performed a marketability analysis of the property focusing on the July 1988 date and looking at empirical data prior to and after that point in time. The data he examined encompassed the rate of building permit issuance as well as the supply of residential lots and their sales performance. The witness traced the ebbs and flows of the real estate market in the 1980's and early 1990's. We need not describe the witness' testimony in detail. Suffice it to say, Sterling noted that the tremendous growth in residential development marking the early 1980's had become exhausted by 1986. Thereafter, the real estate market suffered a downward trend, reaching its lowest point in 1990 or 1991. After examining residential developments in West Windsor, Sterling observed that by 1988 and 1989 there was a tremendous glut of residential lots available in the Township and the surrounding area. The witness noted that a substantial number of developers had stopped submitting development plans after obtaining preliminary approval.

According to Sterling the July 1988 letter had a minimal effect on the value of the property. Instead, deteriorating market conditions were at play, and Princeton Manor was faced with serious business decisions, the principal problem being whether to invest the $40,000 necessary to determine the suitability of the land for septic systems. Sterling concluded that the value of the property decreased after July 1988 because of a downward mar-

ket, and not due to the Township's interest in acquiring the land for development of a park.

At the conclusion of the trial, the Law Division issued a written opinion in which it determined that compensation should be awarded based upon the value of the property on July 29, 1988. In reaching this conclusion, the trial court emphasized that the July 1988 letter was written on official West Windsor stationery, signed by the Township Administrator and, by its terms, constituted "formal notification" of the Township's interest in acquiring the property and its ability to obtain necessary funding. The court further reasoned that the letter constituted the culmination of a series of events, including designation of the land as a potential site for a community park in the Township's master plan, that cast a chill on the owners' ability to develop the property. The court added that Princeton Manor held the property for use in a commercial venture with a profit motive, and that it was unreasonable to expect the partnership to actively pursue development of the land in light of the uncertainties created by the Township's letter.

## II.

We begin our analysis by restating the obvious. This case does not involve a claim of inverse condemnation. Inverse condemnation is a "shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *United States v. Clarke*, 445 *U.S.* 253, 257, 100 *S.Ct.* 1127, 1130, 63 *L.Ed.*2d 373, 377 (1980). It is a remedy afforded to a landowner whose property has been taken *de facto*. *In re Jersey Central Power and Light Co.*, 166 *N.J.Super.* 540, 544, 400 *A.*2d 128 (App.Div.1979). A compensable taking may "occur when governmental action substantially destroys the beneficial use of private property." *Littman v. Gimello*, 115 *N.J.* 154, 164, 557 *A.*2d 314 (quoting *Schiavone Constr. Co. v. Hackensack*, 98 *N.J.* 258, 263, 486 *A.*2d 330 (1985)), *cert denied*, 493 *U.S.* 934, 110 *S.Ct.* 324, 107

L.Ed.2d 314 (1989); *see also Washington Market Enters. v. City of Trenton,* 68 *N.J.* 107, 343 *A.2d* 408 (1975); *Lomarch Corp. v. Mayor of Englewood,* 51 *N.J.* 108, 237 *A.2d* 881 (1968); *Morris County Land Improvement Co. v. Tp. of Parsippany–Troy Hills,* 40 *N.J.* 539, 193 *A.2d* 232 (1963).

In the context of inverse condemnation, our Supreme Court has said that "[g]overnment plans ordinarily do not consti-tute invasion or taking of property." *Littman v. Gimello,* 115 *N.J.* at 161, 557 *A.2d* 314; *see also Danforth v. United States,* 308 *U.S.* 271, 60 *S.Ct.* 231, 84 *L.Ed.* 240 (1939); *Wilson v. City of Long Branch,* 27 *N.J.* 360, 142 *A.2d* 837, *cert. denied,* 358 *U.S.* 873, 79 *S.Ct.* 113, 3 *L.Ed.*2d 104 (1958). "The mere plotting and planning in anticipation of condemnation without any actual physical appro-priation or interference does not constitute a taking." *Kingston East Realty Co. v. State,* 133 *N.J.Super.* 234, 239, 336 *A.2d* 40 (App.Div.1975); *see also Rieder v. State Dep't of Transp.,* 221 *N.J.Super.* 547, 555, 535 *A.2d* 512 (App.Div.1987); *Schnack v. State,* 160 *N.J.Super.* 343, 349–50, 389 *A.2d* 1006 (App.Div.), *certif. denied,* 78 *N.J.* 401, 396 *A.2d* 587 (1978); *Far–Gold Constr. Co. v. Borough of Chatham,* 141 *N.J.Super.* 164, 169, 357 *A.2d* 765 (App.Div.1976). This is true notwithstanding the fact that such governmental action often results in the impairment of the mar-ketability of property subject to potential future condemnation. *Rieder v. State Dep't of Transp.,* 221 *N.J.Super.* at 556, 535 *A.2d* 512. "[E]ven a substantial reduction of the attractiveness of the property to potential purchasers does not entitle the owner to compensation under the Fifth Amendment." *Kirby Forest Indus. v. United States,* 467 *U.S.* 1, 15, 104 *S.Ct.* 2187, 2197, 81 *L.Ed.*2d 1, 14 (1984). Thus, "a mere proposed taking ... does not warrant compensation" merely because it may cause potential buyers "to shy away from purchasing [the] property." *Schnack v. State,* 160 *N.J.Super.* at 350, 389 *A.2d* 1006; *see also Agins v. City of Tiburon,* 447 *U.S.* 255, 263 n. 9, 100 *S.Ct.* 2138, 2143 n. 9, 65 *L.Ed.*2d 106, 113 n. 9 (1980); *Danforth v. United States,* 308 *U.S.* at 284–85, 60 *S.Ct.* at 236, 84 *L.Ed.* at 246; *Frazier v. Lowndes*

*County, Miss., Bd. of Educ.,* 710 *F.*2d 1097, 1100 (5th Cir.1983); *Jersey City Redevelopment Agency v. Bancroft Realty Co.,* 117 *N.J.Super.* 418, 423, 285 *A.*2d 48 (App.Div.1971).

As we said at the outset, this case does not involve a *de facto* taking. Instead, we are concerned here with the date for valuation. In proposing the alternative enumerated events for fixing the date of valuation, the Eminent Domain Revision Commission was troubled by cases in which properties were held in limbo of threatened condemnation for prolonged periods with a consequent reduction of market value. *See The Eminent Domain Revision Commission,* Section V, p. 28 (1965). The Commission recommended that if a governmentally-inspired event occurs prior to the filing of the complaint that has the effect of increasing or decreasing the value of the property, then the date of that event should be the date for valuation. *Ibid.* In adopting the Commission's proposal, the Legislature obviously intended to protect the condemnee from a substantial decrease in the value of the property which is attributable to the cloud of condemnation caused by the condemnor's acts. The statute was also designed to protect the condemnor where the value of the property substantially increased because of the proposed governmental taking.

By its very terms, *N.J.S.A.* 20:3–30 requires that the action taken by the condemnor must "substantially affect[ ]" the condemnee's "use and enjoyment of the property" in order to trigger valuation. Clearly, not every governmental action causing a fluctuation in the value of the property results in fixing the date for valuation. In order for there to be a substantial effect upon a condemnee's property, there must be a "clearly observable and direct interference which is directly related to condemnation." *N.J. Sports and Exp. Auth. v. Giant Realty Assocs.,* 143 *N.J.Super.* 338, 353–54, 362 *A.*2d 1312 (Law Div.1976). "A substantial effect upon the use and enjoyment of property is occasioned when the condemnor takes action which directly, unequivocally and immediately stimulates [a significant] upward or downward fluctu-

ation in value and which is directly attributable to a future condemnation." *Id.* at 353, 362 *A.*2d 1312.

Our research discloses only one reported decision dealing with the precise issue raised here. In *N.J. Sports Exp. Auth. v. Giant Realty Assocs.,* 143 *N.J.Super.* 338, 362 *A.*2d 1312, the New Jersey Sports and Exposition Authority instituted an action to condemn Giant Realty's property for development of the Sports Complex. Four alternative events for fixing the valuation date were proposed—the passage of the Hackensack Meadowlands Development Commission's resolution denying all pending building and subdivision applications to property owners in the Meadowlands, the inclusion of Giant Realty's property in the Sports Complex Zone on the Commission's zoning map, the denial by the Commission of Giant Realty's development application, or the filing of the Authority's condemnation complaint. *Id.* at 352, 362 *A.*2d 1312. Because the value of the property had substantially increased, the Authority argued that the earliest possible triggering event—the Commission's denial of all pending development applications in the area of the Sports Complex—was the appropriate date for valuation. In support of that contention, the Authority presented a real estate expert who testified that the Commission's resolution "had the effect of destroying Giant Realty's right to use its property in the impact zone," thus rendering it essentially valueless. *Id.* at 354, 362 *A.*2d 1312. Giant Realty claimed that the only act directly and substantially affecting the market value of the property was the Commission's denial of its application for development. *Ibid.* Because its application for development was filed with the Commission only after the Commission's denial of "pending" applications, Giant Realty asserted that the only specific governmental act that substantially affected its enjoyment and use of its property was the actual denial of its later application. *Ibid.*

Judge Trautwein concluded that only the denial of Giant Realty's application for development substantially affected its use and enjoyment of the property. *Id.* at 355, 362 A.2d 1312. In reaching that conclusion, the judge noted, "[t]here is no clearer

example of an event which precipitates a fluctuation in the value of vacant property than a denial of a building application." *Ibid.* The judge rejected the Authority's argument that its earlier denial of all pending applications for development put potential purchasers on notice that all future projects would be barred, thus rendering the property virtually unsalable. *Id.* at 357, 362 *A.*2d 1312. In doing so, he reasoned that the denial of all pending applications affected the property "by placing potential purchasers or lessees in a more watchful and wary posture," but did not directly impair Giant Realty's use and enjoyment of its land. *Ibid.* In a similar vein, the judge found that inclusion of Giant Realty's property in the Sports Complex Zone on the zoning map affected the subject property but not enough to establish the valuation date. *Id.* at 357–58, 362 *A.*2d 1312. The judge conceded that when the map was actually published, "[a] prospective purchaser at that time knew that this parcel was earmarked for taking and, as a matter of prudent business, would shy away from purchasing." *Ibid.* However, because the zoning map was published only after Giant Realty's application for development was denied, the judge determined that the earlier event fixed the date for valuation. *Id.* at 358, 362 *A.*2d 1312.

Against this backdrop, we are convinced that the July 29, 1988 letter did not substantially affect Princeton Manor's use and enjoyment of the property within the meaning of *N.J.S.A.* 20:3–30(c). The letter contained no promise by the Township that it would ultimately condemn the property. Instead, the Township indicated it "may" acquire the property for development of a community park in accordance with the master plan and that it had obtained a loan commitment to enable it to take this course. Prior to the creation of Princeton Manor and the purchase of the property, Phillip Kramer was aware of the fact that the land was a potential site for a community park. The master plan made that potential crystal clear. So too, Princeton Manor either knew or should have known that the Township had obtained a low interest loan in order to acquire and develop the property as a park and that Green Acres funding was available. The Township Commit-

tee's resolution was a matter of public record. Clearly, these events did not dissuade Princeton Manor from proceeding with its plan for development.

■ The Township's letter did not earmark the property for taking. Instead, it was merely a preliminary step to a potential future condemnation. The Eminent Domain Act recognizes the need of the condemning authority to assess the suitability of property for public use. To facilitate the condemnor's examination of available alternatives, *N.J.S.A.* 20:3–16 allows it to "enter upon any property which it has authority to condemn for the purpose of making studies, surveys, tests, soundings, borings and appraisals" and requires appropriate notification of the property owner by certified mail. Undoubtedly, these pre-taking activities may affect the property owner's interests, but they do not *per se* constitute a substantial interference with the owner's use and enjoyment of the property. Had the Legislature intended to freeze valuation for condemnation purposes on the date of such exploratory activities, it would have said so in clear and unmistakable language.

The Legislature's experience with the Blighted Area Act (*N.J.S.A.* 40:55–21 to –21.13) is instructive. The Act was amended in 1967 to require that the value of property acquired in connection with the redevelopment of a blighted area "shall be ... no less than the value as of the date of the declaration of blight by the governing body upon a report by [a] planning board." *L.* 1967, *c.* 218. This provision was carried over when the Act was repealed and is now contained in *N.J.S.A.* 20:3–38. In enacting this provision, the Legislature recognized that "the ordinary and natural consequence of a declaration of blight is to trigger a decline in value." *Newark Housing Authority v. Ricciardi*, 176 *N.J.Super.* 13, 18, 422 *A.2d* 78 (App.Div.1980). "Because the alternative valuation date is based on the presumption that a blight declaration will adversely affect value, the Legislature did not impose on condemnees the obligation to prove that an actual

decline in value between the declaration date and the taking date was in fact attributable to the declaration." *Id.* at 19, 422 *A.*2d 78.

In contrast, the Legislature commanded the condemning authority in other cases to engage in exploratory activities but did not indicate that such preliminary steps serve to fix the date for valuation. We do not believe that the Legislature intended to bind the condemnor to pay the value of the property as it exists when such preliminary steps are taken. Were we to accept Princeton Manor's argument, the condemnor would not be bound to purchase the property but would be required to pay the price of the land at that earlier date, even though the decision to make the purchase may come at a time when the property's value is significantly lower. In the context of the facts here, the Township would be forced to pay an unreasonable price the market would not otherwise bear simply because it gave the property owner notice that the land was designated as a potential site for a park in the master plan and was under consideration for such a public use.

■ Furthermore, the Township's letter did not prevent Princeton Manor from seeking to develop its property. It could have pursued its development plan by perfecting its application for major subdivision approval, thus compelling the Township to determine whether to seek condemnation. *Pizzo Mantin Group v. Tp. of Randolph,* 137 *N.J.* 216, 229, 645 *A.*2d 89 (1994). Such an undertaking would have added to the value of the property and, assuming good faith, would have been compensable in the event of a subsequent taking. *State v. F & J Partnership,* 250 *N.J.Super.* 19, 27, 593 *A.*2d 352 (App.Div.1991). Concededly, percolation tests would have been expensive. Seeking an amendment of the sewer plan would also have been a costly process. These were business risks that would have confronted Princeton Manor in any event. The overriding fact remains that Princeton Manor has pointed to no facts which would have barred it from seeking to carry out its development plans. Instead, the partnership attempted to negotiate the best deal it could with the Township, but market forces

impaired its position. In the context of this case, Princeton Manor and not the Township taxpayers should bear this loss.

The order fixing July 29, 1988 as the date for valuation is reversed. The matter is remanded to the Law Division for determination of the appropriate valuation date consistent with this opinion.